2007 UT 21
State of Utah, in the interest of S.M., K.K., A.K., M.K., M.K., J.K., J.K., K.K., M.K., R.K., and L.K., persons under eighteen years of age.
Office of the Guardian ad Litem, Appellant,
v.
H.M., Appellee.
No. 20051030.
Supreme Court of Utah.
FILED February 23, 2007.
This opinion is subject to revision before final publication in the Pacific Reporter.
Mark L. Shurtleff, Att'y Gen., John M. Peterson, Carol L. C. Verdoia, Asst. Att'ys Gen., Salt Lake City for the State.
Martha Pierce, Kristin G. Brewer, Anthony Ferdon, Salt Lake City, for the Office of the Guardian ad Litem.
Gary L. Bell, South Jordan, for H.M. Daniel Virgil Irvin, Salt Lake City, for J.D.K., S.K.

On Certification from the Utah Court of Appeals.
DURRANT, Justice:

INTRODUCTION
¶1 The Office of the Guardian ad Litem ("GAL") appeals directly from a permanency order by the juvenile court returning all but two of the eleven children of J.D.K. ("Father") and H.M. ("Mother") to Mother's custody. The GAL's appeal presents us with the following issues: (1) whether the permanency order was final for purposes of appellate review; (2) whether the juvenile court applied the correct legal standard in deciding whether to return the children to Mother's custody; and (3) whether the juvenile court committed reversible error in applying rule 20A(h)(1) of the Utah Rules of Juvenile Procedure to exclude as untimely testimony from the GAL's expert witness, Dr. Goldsmith.
¶2 We conclude, first, that the permanency order returning the children to Mother's custody was final for purposes of appellate review. Second, we agree with the GAL that the juvenile court was required to apply the safety standard provided in Utah Code section 78-3a-312(2)(a), but our review of the record leaves us satisfied that the juvenile court applied the correct standard. And third, we hold that the juvenile court misapplied rule 20A(h)(1) of the Utah Rules of Juvenile Procedure in excluding expert testimony proffered by the GAL, but that the error was harmless. We therefore affirm the juvenile court.

BACKGROUND
¶3 Mother and Father have eleven children together: S.K.[1], Ke.K., A.K., Ma.K., Me.K., Ja.K., Je.K., Ki.K., Mi.K., R.K., and L.K. Due to multiple instances of neglect and abuse that need not be recited here, the State filed an abuse and neglect petition involving the first ten children of Father and Mother; and on July 6, 2004, the juvenile court entered an order adjudicating them abused and neglected children. On August 2, 2004, the juvenile court adjudicated the eleventh child, an infant girl born to Mother and Father on July 3, 2004, to be a sibling at risk, bringing her within the juvenile court's jurisdiction. The court later added findings regarding Mother's involvement in the abuse and neglect in an order dated February 12, 2005.
¶4 In the course of the proceedings in this case, all of the children but L.K. were removed. The infant, L.K., remained with Mother.
¶5 The juvenile court initially set the permanency goal for all of the children in DCFS custody as reunification with Mother and ordered reunification services. Reunification services were later terminated as to A.K. Initially, Mother was allowed visitation with the children, but visitation was suspended in February 2005. Reunification services were not provided to Father, who had never had physical custody of the children. The court also put in place a no-contact order between Father and the children.

I. APRIL PERMANENCY HEARING
¶6 In April 2005, Juvenile Court Judge Andrew Valdez held a permanency hearing as required by Utah Code section 78-3a-312(1)(a) for all of the children in DCFS custody except A.K. (the "April Permanency Hearing").[2] In accordance with Utah Code section 78-3a-312(2)(a), Judge Valdez inquired at the April Permanency Hearing whether the children could safely be returned to Mother's custody. With regard to the children's safety, Judge Valdez heard three days of testimony from Mother, the children's therapists, and Mother's therapists that focused in large measure upon Mother's acknowledgment of past abuse as it related to her ability to protect the children from future abuse. The parties disputed whether Mother had made enough of an acknowledgment of past abuse and developed sufficient empathy to demonstrate that the children would be safe in her care. Judge Valdez also interviewed the children on the record in his chambers with only the attorneys present.
¶7 At the conclusion of the April Permanency Hearing, Judge Valdez made an oral ruling, which he revised at a clarification hearing on April 15, 2005, and entered as a written order on May 25, 2005. Judge Valdez's written findings included the following positive assessments with respect to Mother and the safety of the children:
2. Based upon the testimony of Ms. Merkley and Ms. Peters, the therapists for [Mother], [Mother] has made significant adjustments with respect to the matters which led to the removal of the children from her care.
3. [Mother] has made progress in what this Court has ordered her to do in terms of counseling and therapy.
4. The children have expressed that they desire to return home to live with their mother . . . and have not expressed any fear of returning home to live with their mother.
5. [Mother] has shown marked improvement and the Court feels that she would be capable of standing up for either herself or the children, and that [Mother] would be capable of protecting the children.
6. [Mother] has a clean and suitable home for the children.
¶8 Nevertheless, Judge Valdez also found the following:
7. Returning the children immediately would not be in their best interests and may pose substantial risk or detriment to their emotional well-being based upon the testimony of their therapists.
8. It is in the best interests of the children for reunification services to be extended with respect to [Mother], and for the children['s] therapists to formulate a plan for transitioning them home without substantial risk or detriment to their emotional well-being.
9. Initial supervision by a therapist of the visitation between the children and [Mother] is necessary to enable any emotional or behavioral needs of the children to be addressed which may arise in either the resumption of contact with [Mother] or the children's transition to her home.
10. It is necessary for the therapists to formulate a transition plan to address the children['s] emotional and behavioral needs and to address the order in which the children are to return home, the length of time needed for therapeutic assistance in the transition for each child, and continuing therapeutic needs for the family subject to the therapists['] recommendations or further orders of this Court.
He then concluded as a matter of law:
11. Pursuant to Utah Code Ann. § 78-3a-312(4)(d), there has been substantial compliance by [Mother] with the child and family plan, reunification with the children is probable within ninety (90) days, and the extension of reunification services with respect to [Mother] is in the children['s] best interests.
Judge Valdez ordered a ninety-day extension of reunification services for Mother, as well as involvement by therapists "to address any emotional or behavioral issues which may arise in the transition home." The order stated, in part,
B. Supervised visitation between [Mother] and each of the above-named children is to begin immediatelythe first to occur the weekend of April 15, 16 or 17, 2005with the purpose of moving towards extended and unsupervised visitation and, ultimately, transitioning the children home by the next hearing date or sooner, subject to [Mother's] continued compliance.

II. JULY PERMANENCY HEARING
¶9 After Judge Valdez extended reunification services at the April Permanency Hearing but before the case was resolved, he recused himself because criminal charges had been filed against his son in connection with an altercation that occurred outside the courthouse between the son and protestors during the April Permanency Hearing. Judge Elizabeth Lindsley was assigned to the case in Judge Valdez's place and held another permanency hearing in July 2005 (the "July Permanency Hearing"). Between the two permanency hearings, visitation between Mother and the children had resumed, but most of the children were still in their foster homes. The eldest son, K.K., and one of the other boys, Ja.K., had been returned to Mother's custody. But the eldest child, S.K., had filed an affidavit and motion to change her permanency goal from reunification with Mother to permanent custody or adoption. And A.K.'s permanency goal had been modified to guardianship with a concurrent goal of adoption.
¶10 The July Permanency Hearing was held on July 18, 21, and 22, 2005. During this three-day hearing, Judge Lindsley took evidence from both sides regarding whether it would be safe to return the children to Mother's custody. She also took judicial notice of the transcripts from the April Permanency Hearing. The children's therapists, Mother, and Mother's therapists testified, and Judge Lindsley interviewed each of the children individually in her chambers, as Judge Valdez had previously done. Judge Lindsley's interviews of the children were recorded and were held in the presence of counsel. Judge Lindsley also reviewed affidavits given by S.K. and A.K. and other evidence regarding events that had occurred between the two permanency hearings.
¶11 As in the April Permanency Hearing, much of the testimony at the July Permanency Hearing focused on the degree to which Mother had acknowledged past instances of abuse and the negative effects that a failure to acknowledge such past instances would have on the children's safety. There was also evidence presented, however, regarding Mother's behavior since the April Permanency Hearing and the children's reactions to the resumption of visitation with Mother.
¶12 After the July Permanency Hearing, Judge Lindsley made an oral ruling on August 23, 2005, and then entered a written "Permanency Order" on October 27, 2005. In the written permanency order, Judge Lindsley made the following findings:
1. Reasonable efforts have been made by DCFS to finalize the permanency plan for the children which has been to return home. DCFS, Mr. Giles and Mr. Madsen are to be commended for their efforts. This finding of fact is made by clear and convincing evidence.
2. [Mother] is in substantial compliance with court orders and the service plan.
3. It is safe to return [Ma.K., Me.K., Je.K., Ki.K., Mi.K., and R.K.] to the custody of [Mother], provided family preservation services are provided to the family.
4. [Mother] has an appropriate home for the children.
5. [Mother] has followed through with the services required of her by the court and necessary for the return of her children. These services were different from the ones that had previously been provided by DCFS. The special tailoring of the YWCA group by DCFS and the court, and the specifics with the peer parent were above and beyond reasonable. Mr. Giles and Mr. Madsen worked hard on this case in providing services to this family.
Judge Lindsley therefore ordered the following:
1. Custody and guardianship of the children, with the exception of [S.K. and A.K.][,] are returned to [Mother]. The children, with the exception of [S.K. and A.K.][,] shall be returned forthwith.
2. DCFS shall provide family preservation services to [Mother] and the children in her custody. [Mother] and the children in her custody shall cooperate and participate in the services. . . .
. . . .
4. [Mother] shall continue to attend and participate with her classes and parenting therapy . . . .
. . . .
7. [Father] shall have no contact of any sort with the children. He is not to speak, communicate with, or approach the children. If the children approach him, he is not to speak to them or any one of them. [Father and Mother] are responsible for enforcing this provision.
¶13 On behalf of all of the children except A.K., S.K., and Ke.K., the GAL appealed Judge Lindsley's permanency order to the court of appeals, which then certified this case to us prior to final judgment. Before certifying the case to us, however, the court of appeals directed the parties to brief the finality of the permanency order for purposes of appellate review.
¶14 The GAL maintains that the permanency order was final because the order granted permanent custody of all of the children but A.K. and S.K. to Mother. It argues that Judge Lindsley erred in awarding custody of the children to Mother because she considered Mother's "substantial compliance" rather than the ultimate question of whether the children would be safe in Mother's custody. Additionally, the GAL argues that the court erred by excluding Dr. Goldsmith, an expert witness proffered by the GAL at the July Permanency Hearing, as untimely under rule 20A(h)(1) of the Utah Rules of Juvenile Procedure because rule 20A(h)(1) applies to "adjudication trials," not permanency hearings, and because the exclusion of Dr. Goldsmith's proffered testimony regarding the importance of acknowledgment of abuse was prejudicial and a violation of the children's due process rights. We have jurisdiction to hear the GAL's appeal pursuant to Utah Code section 78-2-2(3)(b).

STANDARDS OF REVIEW
¶15 Whether an order is final and appealable is an issue with regard to which this court makes an original determination.[3] Whether the juvenile court applied the appropriate legal standard at the July Permanency Hearing is a question of law that we review for correctness.[4] And whether the juvenile court correctly applied rule 20A(h)(1) of the Utah Rules of Juvenile Procedure is a question of law that we review for correctness.[5]

ANALYSIS

I. THE PERMANENCY ORDER AWARDING CUSTODY OF THE CHILDREN TO MOTHER WAS FINAL AND APPEALABLE
¶16 Before certifying this case to us, the court of appeals instructed the parties to brief the issue of whether the permanency order in this case was final for purposes of appellate review. Inexplicably, Father failed to provide the requested briefingeven though Father was the party who had initially raised, in a motion for summary dismissal, the argument that the permanency order was not final. Both Mother and the GAL briefed the issue, but they agreed that the order in this case was final for purposes of appeal. Mother then reversed her position at oral argument and argued that the order was not final.
¶17 Because this issue is jurisdictional, we address it. We conclude that permanency orders such as this that terminate DCFS's custody of a minor, end reunification services, and return the minor to the custody of a parent are final for purposes of appellate review.
¶18 We have said that "[t]he finality of an order in juvenile proceedings is determined the same way as the finality of an order in other courts."[6] A final order "is one that ends the current juvenile proceedings, leaving no question open for further judicial action."[7] But our inquiry into whether an order leaves a question open for further judicial action is often unconcerned with the question of whether the juvenile court's jurisdiction over a minor continues beyond its entry of the order. Because "considerations regarding a child's welfare are rarely, if ever, static and because the child's environment is constantly evolving," the juvenile court frequently retains jurisdiction over cases after some of the issues have been finally resolved.[8] For instance, the juvenile court retains jurisdiction over a child whose custody is awarded in a neglect proceeding, but "that does not mean the neglect adjudication is not final."[9] "[A]n order entered upon disposition of an adjudicated petition of abuse, neglect or dependency is a final order on the merits of the petition" because "it ends the current juvenile proceedings begun by the petition, and is a final factual determination of the underlying petition."[10] On the other hand, shelter orders and orders denying motions for temporary custody of children are not final because they make an interim determination pending additional proceedings.[11]
¶19 The October 27, 2005 permanency order from which the GAL appeals is final and appealable because it terminates the custody of DCFS and awards custody to Motherfinally implementing the permanency goal set for the children. In that permanency order, the court found that all of the children then in DCFS custody, except A.K. and S.K., would be safe in Mother's custody despite the prior abuse and neglect leading to their removal.
¶20 This is not an interim award of custody pending additional findings of fact. No further proceedings are contemplated with regard to the question of whether, given the record of past problems, the children should be returned to Mother. Because Father never had physical custody of the children and has not sought physical custody, outstanding issues regarding his rights to the children do not affect the finality of the order awarding custody to Mother. Neither is finality affected by the juvenile court's order that the family be involved in continuing protective services and counseling. The permanency order at issue is a final determination of Mother's custody, and the juvenile court is specifically authorized under Utah Code section 78-3a-312(4)(f) to exercise its discretion to order protective services and to make additional orders in the best interest of the minor when DCFS's custody of a minor has been terminated.[12]
¶21 Because we hold that the permanency order was final and appealable, we will now proceed to address the remaining two issues presented by the GAL's appeal.

II. JUDGE LINDSLEY APPLIED THE CORRECT STANDARD, FINDING AFTER A LENGTHY PERMANENCY HEARING THAT THE CHILDREN COULD SAFELY BE RETURNED TO MOTHER'S CUSTODY
¶22 The GAL argues that Judge Lindsley did not apply the correct legal standard when she returned all of the children except S.K. and A.K. to Mother's custody after the July Permanency Hearing. According to the GAL, Judge Lindsley's findings indicate that she was ultimately concerned with whether Mother was in "substantial compliance" with the requirements placed on her by the court, rather than with the safety of the children, the standard provided in Utah Code section 78-3a-312(2)(a). The GAL contends that Judge Lindsley made this mistake because she misinterpreted Judge Valdez's findings from the April Permanency Hearing to contain a determination that the children would be safe if returned to Mother. The GAL does not otherwise challenge the juvenile court's findings of fact and ultimate conclusion that the children could safely be returned to Mother's custody.
¶23 We agree with the GAL that Judge Valdez had not conclusively determined at the April Permanency Hearing that the children could safely be returned to Mother. Judge Lindsley was therefore required to determine in accordance with Utah Code section 78-3a-312(2)(a) whether the children "may safely be returned" to Mother. But our review of the record indicates that Judge Lindsley did in fact focus on the safety of the children and that she considered Mother's compliance as it related to the children's safety.
¶24 Because the GAL alleges that Judge Lindsley was confused as to the appropriate standard due to her misinterpretation of Judge Valdez's findings associated with the April Permanency Hearing, we first discuss the April Permanency Hearing held by Judge Valdez. We then discuss the July Permanency Hearing held by Judge Lindsley and the resulting permanency order awarding custody of the children to Mother.

A. At the April Permanency Hearing, Judge Valdez Determined That Return of the Children to Mother Posed a Risk of Emotional Detriment Justifying Extension of Reunification Services
¶25 When the court sets a minor's primary permanency goal as reunification with a parent and reunification services are ordered, as in this case, Utah Code section 78-3a-312(1)(a) provides that "with regard to a minor who is in the custody of the [DCFS], a permanency hearing shall be held by the court no later than 12 months after the original removal of the minor."[13] At the permanency hearing, the juvenile court is required to determine "whether the minor may safely be returned to the custody of the minor's parent."[14] The minor may not be returned to the parent if return "would create a substantial risk of detriment to the minor's physical or emotional well-being."[15] Ultimately, if the juvenile court determines that the minor will be safe in the parent's custody, the court returns the minor; but if the minor is not returned to the parent, the court is ordinarily required to terminate reunification services and to "make a final determination regarding whether termination of parental rights, adoption, or permanent custody and guardianship is the most appropriate final plan for the minor."[16]
¶26 Judge Valdez stated that he was acting in accordance with these statutory requirements when he held the April Permanency Hearing. However, rather than returning the children to Mother's custody or terminating reunification services, Judge Valdez used an exception provided in Utah Code section 78-3a-312(4)(d) to extend reunification services for up to ninety days. Under that exception, in circumstances where the minor cannot be returned to the parent immediately, "the court may extend reunification services for no more than 90 days if the court finds that: (i) there has been substantial compliance with the child and family plan; (ii) reunification is probable within that 90-day period; and (iii) the extension is in the best interest of the minor."[17]
¶27 In connection with the April Permanency Hearing, Judge Valdez explicitly found that "[Mother] has made significant adjustments with respect to the matters which led to removal of the children from her care"; that "[t]he children have expressed that they desire to return home to live with their mother . . . and have not expressed any fear of returning home to live with their mother"; that "[Mother] has shown marked improvement and the Court feels that she would be capable of standing up for either herself or the children"; and that Mother "has a clean and suitable home for the children." However, he also determined that "[r]eturning the children immediately would not be in their best interests and may pose substantial risk or detriment to their emotional well-being based upon the testimony of their therapists" and that "[i]t is in the best interests of the children for reunification services to be extended with respect to [Mother], and for the children['s] therapists to formulate a plan for transitioning them home without substantial risk or detriment to their emotional well-being." He concluded, "Pursuant to Utah Code Ann. § 78-3a-312(4)(d), there has been substantial compliance by [Mother] with the child and family plan, reunification with the children is probable within ninety (90) days, and the extension of reunification services with respect to [Mother] is in the children['s] best interests." He therefore ordered that reunification services be extended for ninety days; that supervised visitation begin "immediately" "with the purpose of moving towards extended and unsupervised visitation and, ultimately, transitioning the children home by the next hearing date or sooner, subject to [Mother's] continued compliance"; and that a therapist be involved to support the children and address emotional and behavioral issues.
¶28 Read in its entirety, Judge Valdez's order makes clear his conclusion that it would not be safe to immediately return the children to Mother's custodybut his findings and order indicate that his remaining concerns stemmed primarily from the risk of detriment that a hasty transition would present to the children's emotional well-being. Judge Valdez apparently contemplated that the safety of the children would likely be protected by a gradual transition into Mother's home, supervised by a therapist who would be there "to enable any emotional or behavioral needs of the children to be addressed which may arise in either the resumption of contact with [Mother] or the children's transition to her home."

B. Judge Lindsley Heard Lengthy Testimony on the Safety of the Children at the July Permanency Hearing and Reviewed Transcripts of the April Permanency Hearing Before Returning the Children to Mother's Custody
¶29 Because Judge Valdez extended reunification services rather than making a final permanency order, it became necessary for the juvenile court to hold another permanency hearing at the expiration of the ninety-day extension.[18] At this second permanency hearing, which, due to Judge Valdez's recusal, was held before Judge Lindsley in July, the same standard that Judge Valdez applied at the April Permanency Hearing was applicable. Judge Lindsley was required to determine whether the children could safely be returned to Mother's custody.[19]
¶30 Accordingly, at the July Permanency Hearing Judge Lindsley heard three days of testimony focusing on the safety of the children in addition to reviewing the transcripts from the April Permanency Hearing. Judge Lindsley then concluded that, with the exception of S.K. and A.K., all of the children who had not already been placed in Mother's custody could safely be returned to her custody, "provided family preservation services are provided to the family." She therefore returned custody of all of the children except S.K. and A.K. to Mother.
¶31 Despite Judge Lindsley's express finding in the permanency order that the children would be safe in Mother's custody, the GAL argues that we should read statements made by Judge Lindsley in both her oral ruling and the permanency order as proof that Judge Lindsley improperly substituted an inquiry into whether Mother was in "substantial compliance" with the requirements of the child and family plan for an inquiry into the children's safety in Mother's custody. Specifically, the GAL points to statements made by Judge Lindsley in her oral ruling to the effect that the July Permanency Hearing had introduced "nothing new," that she was going to make the "same findings of fact as Judge Andrew Valdez," and that the case previously had not met any criteria for extension of reunification services past the April Permanency Hearing. The GAL argues that if Judge Lindsley truly made the "same findings" as had Judge Valdez, she would necessarily conclude that it was not safe to return the children to Mother.
¶32 Additionally, the GAL maintains that because Judge Valdez found "substantial compliance" and because Judge Lindsley repeated the finding of "substantial compliance" and stated that Mother "has followed through with the services required of her by the court and necessary for the return of her children," Judge Lindsley must have erroneously applied a "substantial compliance" standard rather than the "safety" standard.
¶33 Judge Lindsley's comments in connection with her oral ruling do indicate a belief that at the April Permanency Hearing Judge Valdez should have immediately returned custody of the children to Mother rather than using the exception in section 78-3a-312(4)(d) to support the children's transition into Mother's home. Nevertheless, Judge Lindsley recognized that reunification services were extended and that "there was never a motion for no reunification services." Upon expiration of the time set for reunification services, Judge Lindsley therefore held a permanency hearing in accordance with Utah Code sections 78-3a-111(2)(f) and 78-3a-312.
¶34 Our review of the record from the July Permanency Hearing and Judge Lindsley's permanency order leaves us satisfied that Judge Lindsley was herself ultimately concerned with whether the children could safely be returned to Mother, as required by Utah Code section 78-3a-312(2)(a). At the July Permanency Hearing, the GAL provided extensive testimony on the impact that return of the children would have on their safety and mental health. And during that hearing, Judge Lindsley made statements indicating that she understood that her primary concern was with the children's safety.
¶35 In an exchange with counsel on the first day of the hearing Judge Lindsley stated, "[W]here the focus of this hearing is whether it's safe to return the children or not, I think it would be beneficial for this Court to hear from the children, so we will need to make arrangements for the children to come to court." Later, Judge Lindsley interviewed the children individually in her chambers on the record and in the presence of the parties' counsel. During the interviews, she asked each child about recent interactions with Mother and about whether the child felt safe in Mother's care. For instance, during Judge Lindsley's interview with Ja.K., who at that time was already living with Mother, the following exchange took place:
[Q. by Judge Lindsley] Do you feel like you're safe at home?
[A. by Ja.K.] Yeah.
Q. Do you worry about someone hurting you there?
A. No.
Q. Have you ever worried about people hurting you at home?
A. No.
Q. What if somebody had come to the house and was going to hurt you, what would you do?
A. I wouldn't have to worry about that because it's not going to happen.
Q. Okay. Well, let's say what if, because, I mean, we always figure we're safe there but what if somebody were to come to the house?
A. Um, I don't know.
Q. Would you call the police?
A. I guess so.
Q. Do you know how to call the police?
A. Yeah.
Q. How?
A. I'm not dumb.
Q. I know you're not dumb. Do you just call 911 if someone was there to hurt you?
A. Yeah.
Judge Lindsley's interviews with the other children involved similar exchanges. Together with the lengthy testimony regarding the children's safety at the permanency hearing and Judge Lindsley's ultimate finding that the children were safe in Mother's custody, these statements by Judge Lindsley demonstrate that she was indeed ultimately concerned with the children's safety.
¶36 Further, the record shows that Judge Lindsley was not using the term "substantial compliance" as a substitute for the children's safety, but as a measurement of Mother's acknowledgment of prior abuse and compliance with court orders. Throughout both the April and July Permanency Hearings, the GAL argued that Mother had not appropriately acknowledged the prior abuse and neglect suffered by her children and that without this acknowledgment the children could not be safe in her care. Witnesses for the GAL maintained that the children would not be safe physically because Mother could not empathize with them to determine when they were unsafe, and they would not be mentally and emotionally safe because her failure to believe that they were abused would present problems as to their concept of reality.
¶37 The true degree of Mother's acknowledgment was in dispute, however, with the therapists for the children on one side arguing that she had not adequately acknowledged the problem and Mother's therapists on the other stating that Mother had indeed acknowledged the past problems, although she was reluctant to specifically admit those problems because of concerns that doing so would incriminate her in other legal proceedings. Mother's therapists criticized the children's therapists for looking specifically for "magic words" and not allowing visitation in which she could put her professed changes into practice.
¶38 After hearing this testimony at the April Permanency Hearing, Judge Valdez made a number of findings of fact indicating that he had considered this testimony and felt that the degree of Mother's acknowledgment was sufficient for the children's protection. Judge Valdez found that "[b]ased upon the testimony of . . . the therapists for [Mother], [Mother] has made significant adjustments with respect to the matters which led to the removal of the children from her care"; that "[Mother] has made progress in what this Court has ordered her to do in terms of counseling and therapy"; that "[t]he children have expressed that they desire to return home to live with their mother . . . and have not expressed any fear of returning home to live with [her]"; and that "[Mother] has shown marked improvement and the Court feels that she would be capable of standing up for either herself or the children, and that [Mother] would be capable of protecting the children."
¶39 Judge Valdez's findings indicate that his concern with the children's emotional safety was based on therapist testimony that an immediate return of the children to Motherwith whom visitation had previously been suspendedwould be emotionally detrimental. Judge Valdez indicated that he believed reunification with Mother was likely within ninety days, although there was no testimony to indicate that Mother would be likely to make further statements of acknowledgment during that time.
¶40 Because Judge Valdez ordered reunification services and did not return the children to Mother's custody, all of the evidence that was previously considered by Judge Valdez was still relevant at the July Permanency Hearing to assessing the children's safety. Judge Lindsley was not required to give that evidence the same weight as Judge Valdez had given it because it was her prerogative to independently weigh the evidence initially heard at the April Permanency Hearing in light of the additional evidence regarding interactions with the children that occurred between the two permanency hearings.[20]
¶41 Nevertheless, Judge Lindsley still assigned significant weight to Judge Valdez's findings. In reaction to a dispute over the introduction of evidence regarding the degree of Mother's acknowledgment, Judge Lindsley stated as follows:
I have findings from Judge Valdez on what was found at the permanency hearing, which finds with regard to substantial compliance, it was not safe to return the children at that time. Now I'm looking at is it safe today to return the children, so if you can link this up, do it quickly, but I'm not going to rehash everything that Judge Valdez has previously found. He has found substantial compliance by the mother.
¶42 Essentially, although substantial compliance was a legal conclusion necessary for Judge Valdez to extend reunification services, Judge Lindsley also considered Judge Valdez's finding of substantial compliance to reflect on issues regarding Mother's acknowledgment, and she expressed that she was less interested in retreading the controversy regarding the degree of Mother's acknowledgment than in looking at other indicators of the children's safety. When Judge Lindsley stated in connection with her oral ruling that extension of reunification services had not been warranted at the April Permanency Hearing and that there was "nothing new" since the April hearing, it appears that she was expressing her impression that Judge Valdez had essentially already determined that safety would be assured by the next permanency hearing when he found that despite Mother's failure to make complete acknowledgment she had substantially complied, that Mother was capable of protecting the children, and that Mother should get her children back as long as the transition was facilitated by a therapist and Mother continued to comply with court orders. Judge Lindsley indicated that in light of the testimony at the July Permanency Hearing, the outlook was very similar and that the transition of the children to Mother's custody should be completed because the children were safe.
¶43 In sum, despite Judge Lindsley's generalized statements about Judge Valdez's prior findings, we are convinced that Judge Lindsley understood that it was her duty to determine whether the children would be safe if returned to Mother and that she did so in this case.

III. THE JUVENILE COURT INCORRECTLY APPLIED RULE 20A(h)(1) TO EXCLUDE DR. GOLDSMITH'S TESTIMONY, BUT THE ERROR WAS HARMLESS
¶44 Finally, we consider the GAL's argument that the juvenile court erred in excluding the GAL's expert witness, psychologist Dr. Goldsmith, from testifying based on the GAL's failure to disclose the witness at least ten days prior to trial in accordance with rule 20A(h)(1) of the Utah Rules of Juvenile Procedure. Ordinarily, we will not overturn a trial court ruling excluding a proffered witness from testifying unless the trial court "has overreached the broad discretion granted it and thereby affected [the complaining party's] substantial rights."[21] As discussed below, we hold that rule 20A(h)(1) does not apply to permanency hearings and that the court therefore erred in excluding Dr. Goldsmith's testimony based on the GAL's failure to comply with rule 20A(h)(1). We find that the error was harmless and not a violation of the children's due process rights, however, because Dr. Goldsmith's testimony regarding the importance of Mother's acknowledgment was cumulative of other testimony from both the April and July Permanency Hearings.

A. The Juvenile Court Erred in Applying Rule 20A(h)(1) of the Utah Rules of Juvenile Procedure to Exclude Untimely Expert Testimony at the July Permanency Hearing
¶45 On the first day of the July Permanency Hearing, the GAL stated to the court that it intended to call "Dr. Goldsmith" as an expert witness. Later that day, the GAL filed an expert witness designation as a "courtesy." Mother objected to Dr. Goldsmith's offering testimony, and the juvenile court excluded it as untimely under rule 20A(h)(1) of the Utah Rules of Juvenile Procedure. The GAL made a proffer of Dr. Goldsmith's intended testimony and now appeals the exclusion of his testimony.
¶46 The GAL maintains that rule 20A(h)(1) of the Utah Rules of Juvenile Procedure was inapplicable and that the juvenile court should have instead applied rules 26 and 37 of the Utah Rules of Civil Procedure and granted a continuance rather than excluding Dr. Goldsmith's testimony. In contrast to the interpretations of the rules offered by the juvenile court and the GAL, we hold that rule 46 of the Utah Rules of Juvenile Procedure, not rule 20A(h)(1), applies to discovery of expert witnesses in permanency hearings.
¶47 Rule 20A(h) of the Utah Rules of Juvenile Procedure provides for discovery of experts in two types of trials in juvenile court: "adjudication trials" and "termination of parental rights trials."[22] In this case, the juvenile court applied the provision applicable to "adjudication trials," rule 20A(h)(1), which states as follows:
Adjudication trials. Any person who has been identified as an expert whose opinions may be presented at the adjudication trial must be disclosed by the party intending to present the witness at least ten days prior to the trial or hearing unless modified by the court. If ordered by the court, a summary of the proposed testimony . . . shall be filed at the same time.[23]
While the juvenile court apparently recognized that the permanency hearing was not an "adjudication trial," it reasoned that rule 20A(h)(1) applied to permanency hearings based on the language mandating that expert testimony must be disclosed "at least ten days prior to the trial or hearing."[24]
¶48 We note, however, that the language "trial or hearing" in rule 20A(h)(1) is modified by the initial designation of the provision as one that applies to "[a]djudication trials." The "or hearing" language must therefore be taken to refer to an "adjudication hearing." This conclusion is supported by a comparison of the instant language in rule 20A(h)(1) with almost identical "trial or hearing" language in rule 20A(h)(2), the provision applicable to "[t]ermination of parental rights trials."[25] If the reference to a "hearing" in rule 20A(h)(1) were interpreted to extend the application of rule 20A(h)(1) to hearings not associated with an "adjudication," rule 20A(h)(2) would require similar interpretation and it would be unclear which provision would be applicable to any particular "hearing." We find it more consistent with logic and with the apparent structure of the statute to interpret the "or hearing" language in rule 20A(h)(1) as a reference to an "adjudication hearing."
¶49 A permanency hearing is not an adjudication trial or hearing to which rule 20A(h)(1) applies, but is instead a type of disposition hearing to which rule 46 of the Utah Rules of Juvenile Procedure applies. "Adjudication" is a defined term both in the Utah Rules of Juvenile Procedure and in related statutes that refer to "a finding by the court, incorporated in a judgment or decree, that the facts alleged in the [petition alleging the court's jurisdiction] have been proved."[26] In the context of a juvenile court proceeding based on a petition alleging abuse or neglect such as this one, an adjudication trial or hearing is one where the juvenile court determines whether a minor has been abused or neglected and thus whether the minor comes within its jurisdiction.
¶50 If the juvenile court finds abuse or neglect at an adjudication hearing, it then conducts a dispositional hearing where it may make any disposition authorized by Utah Code section 78-3a-118.[27] "Disposition" is defined by the Utah Rules of Juvenile Procedure to mean "any order of the court, after adjudication, pursuant to section 78-3a-118."[28] Permanency hearings are a type of disposition hearing, which in previous versions of the relevant statutes were called "dispositional review hearings."[29] Permanency hearings are held after the initial dispositional hearing in cases where DCFS custody over the minor is continued at the disposition hearing.[30] Permanency hearings "are designed to end the `legal limbo' for the children concerned."[31]
¶51 In contrast to the specific rules for discovery and expert witness disclosure in the context of adjudication trials and termination of parental rights trials, the rule applicable to disposition hearings is explicitly informal. Rule 46(a) of the Utah Rules of Juvenile Procedure provides that "[d]isposition hearings shall be conducted in an informal manner to facilitate the opportunity for all participants to be heard."[32] Rule 46(b) further provides:
The court may receive any information that is relevant to the disposition of the case including reliable hearsay and opinions. Counsel for the parties are entitled to examine under oath the person who prepared the pre-disposition report if such person is reasonably available. The parties are entitled to compulsory process for the appearance of any person, including character witnesses, to testify at the hearing.[33]
¶52 In the context of permanency hearings, the instructions of rule 46 are modified by Utah Code section 78-3a-312(3), which mandates, among other things, that in making a determination regarding whether it is safe to return a minor to the parent's custody "the court shall review and consider: . . . (b) any admissible evidence offered by the minor's guardian ad litem."[34]
¶53 In the absence of strict deadlines for disclosure of expert testimony like those provided for adjudication trials and termination of parental rights trials, the juvenile court has broad discretion to control the conduct and admission of evidence in disposition hearings.[35] But it must abide by the intent expressed in rule 46 that the hearings be managed informally "to facilitate the opportunity for all participants to be heard,"[36] and it must ensure that the disposition hearing meets the requirements of due process.[37]
¶54 As for the permanency hearing in this case, we do not read the requirement of Utah Code section 78-3a-312(3)(b) that the juvenile court "review and consider . . . any admissible evidence offered by the [GAL]" to limit the juvenile court's discretion to exclude expert testimony that the GAL, without good cause, fails to disclose prior to the permanency hearing. We therefore conclude that the juvenile court had discretion in the context of the permanency hearing with respect to deciding whether to admit or exclude Dr. Goldsmith's expert testimony.
¶55 While the GAL correctly argued in its briefs that the juvenile court erred in applying rule 20A(h)(1) to permanency hearings, the GAL erroneously concluded that the juvenile court should have instead applied rule 26 of the Utah Rules of Civil Procedure. The GAL argues, based on the court of appeals' decision in Berrett v. Denver & Rio Grande Western Railroad,[38] that the juvenile court erred in excluding Dr. Goldsmith's testimony instead of granting a continuance because the juvenile court had not set a disclosure deadline for the permanency hearing. In response to the GAL's arguments, the juvenile court also cited rule 26's requirement of a written report as an alternative ground supporting exclusion of Dr. Goldsmith's testimony.
¶56 We note briefly that the provisions for discovery of expert witnesses in rule 26 of the Utah Rules of Civil Procedure are inconsistent with the informal nature of disposition and permanency hearings. Therefore, the expert witness disclosure provisions of rule 26 and the accompanying discovery sanctions in rule 37 do not apply in this case.[39] Furthermore, the court of appeals' decision in Berrett is distinguishable because its holding that a court cannot sanction a party by excluding a witness when there is no judicially mandated deadline for disclosure applies only to courts' use of exclusion of a witness as a discovery sanction under rule 37 of the Utah Rules of Civil Procedure.[40] Thus, we hold that the juvenile court should have applied only rule 46 of the Utah Rules of Juvenile Procedure and exercised its discretion in determining whether Dr. Goldsmith's testimony should have been excluded from the permanency hearing.
¶57 We do not reach the question of whether the juvenile court abused its discretion in this case, however, because in applying rule 20A(h)(1) of the rules of juvenile procedure the juvenile court appeared to believe that exclusion was mandated rather than subject to the court's exercise of discretion. We therefore treat the juvenile court's exclusion of Dr. Goldsmith's testimony as error. As we will now discuss, however, the error was harmless.

B. Dr. Goldsmith's Testimony Was Cumulative and Its Exclusion Was Harmless and Not a Violation of Due Process
¶58 When a trial court errs in excluding evidence, "no new trial . . . is warranted, unless the error affected a substantial right of the party."[41] "An error is harmful if it is reasonably likely that the error affected the outcome of the proceedings."[42] According to the GAL's proffer, Dr. Goldsmith is a child psychologist with training regarding chronic abuse and neglect who would have testified that parental acknowledgment of abuse is important to measure change and assure children's safety; that change is unlikely in a family where there is a chronic history of past abuse, neglect, and DCFS intervention; that a parent's failure to acknowledge abuse and neglect has detrimental effects on the children; that Mother's treatment was superficial; and that the court should not rely simply on whether the children indicate that they would feel safe returning because young children often do not recognize when their needs are not being met. The evidence that Dr. Goldsmith was prepared to provide regarding these issues was, however, largely cumulative of testimony at both the April Permanency Hearing and the July Permanency Hearing.
¶59 Over the course of both permanency hearings, the juvenile court heard extensive testimony regarding the importance of acknowledgment of past abuse and neglect from the doctor who performed Mother's psychological evaluation, from the children's therapists, and from DCFS worker Curtis Giles. These witnesses testified that acknowledgment was important as the first step toward changing a prior pattern of abuse, as well as for the children's mental health. Even one of Mother's therapists, Bonnie Peters, agreed at the April Permanency Hearing that "perpetrators must acknowledge their abuse before the family can begin getting back together." Yet, at both permanency hearings, the degree of Mother's acknowledgment was disputed, with witnesses for the GAL on one side arguing that Mother's statements of acknowledgment were vague and that she continued to blame others for her problems and with witnesses for Mother on the other opining that she had adequately accepted responsibility, made the commitments necessary for change, and was now able to empathize with her children.
¶60 As for the other related issues that Dr. Goldsmith would have addressed if allowed, the juvenile court heard similar testimony from Dr. Davies and two of the children's therapists, Paul Butters and Pamela Mitchell, who testified that a parent's failure to acknowledge isolated a child and could lead the child to question reality and perhaps to psychotic behaviors. It heard testimony questioning the focus of the treatment programs in which Mother was enrolled and the lack of a traditional element of domestic violence treatment. And finally, it heard testimony from witnesses that children often express a desire to return home to their parents, even when they have been seriously abused.
¶61 In short, despite hearing substantially similar testimony to that which Dr. Goldsmith would have offered, the juvenile court was persuaded that Mother had made sufficient changes for the children to be returned safely to her custody. None of the problems raised by Dr. Goldsmith were new or previously unconsidered by the court, and there was nothing in Dr. Goldsmith's proffered testimony to indicate that the court would be likely to give more weight to these problems than it gave to them without Dr. Goldsmith's testimony. We therefore conclude that although the juvenile court erred in excluding Dr. Goldsmith's proffered testimony under rule 20A(h)(1) of the Utah Rules of Juvenile Procedure, the error was harmless. We also conclude that, because Dr. Goldsmith's proffered testimony was cumulative and the error was harmless, the juvenile court's exclusion of Dr. Goldsmith's testimony did not violate the children's due process rights.

CONCLUSION
¶62 In sum, we hold that the July Permanency Order terminating DCFS's custody of the children and vesting custody in Mother was final for purposes of appellate review and that we therefore have jurisdiction to hear the GAL's appeal. Further, our review of the record in this case leaves us satisfied that the juvenile court applied the safety standard of Utah Code section 78-3a-312(2)(a) in returning the children to Mother's custody and did not erroneously confuse the "safety" standard with a "substantial compliance" standard. Finally, we hold that the juvenile court did err in excluding the GAL's expert witness Dr. Goldsmith as untimely under rule 20A(h)(1) of the Utah Rules of Juvenile Procedure, but that the error was harmless and not a violation of the children's due process rights because the testimony was cumulative. We therefore affirm the decision of the juvenile court to return custody of all of the children but S.K. and A.K. to Mother.
¶63 Chief Justice Durham, Associate Chief Justice Wilkins, Justice Parrish, and Justice Nehring concur in Justice Durrant's opinion.
NOTES
[1] S.K.'s name was legally changed to S.M. on April 6, 2005. For convenience, we refer to her as S.K. throughout this opinion.
[2] Although the twelve-month permanency hearing for S.K. was originally scheduled for February 22, 2005, the juvenile court found that a continuance until April was in S.K.'s best interests.
[3] Irvin v. State (State ex rel. S.M.), 2006 UT 75, ¶ 6, ___ P.3d ___.
[4] See, e.g., State ex rel. J.H., 2006 UT App 205, ¶ 5, 138 P.3d 70 ("Whether the juvenile court's actions met the statutory requirements for a permanency hearing is a question of law that we review for correctness.").
[5] See, e.g., In re Fox, 2004 UT 20, ¶ 5, 89 P.3d 127 ("This court generally reviews interpretations of rules for correctness. . . .").
[6] State ex rel. M.W., 2000 UT 79, ¶ 25, 12 P.3d 80.
[7] Id. (internal quotation marks omitted).
[8] State ex rel. E.M., 922 P.2d 1282, 1284 (Utah Ct. App. 1996) (internal quotation marks omitted).
[9] State ex rel. M.W., 2000 UT 79, ¶ 26.
[10] Id. (citations and internal quotation marks omitted).
[11] See State ex rel. A.H. v. Mr. & Mrs. H., 716 P.2d 284, 286 (Utah 1986) (holding that an order of temporary custody pending adjudication of the petition is not final for purposes of appeal); State ex rel. H.J., 1999 UT App 238, ¶ 27, 986 P.2d 115 (holding that an order denying a motion for temporary custody of children pending a final disposition or placement is not final); State ex rel. M.V., 937 P.2d 1049, 1051 (Utah Ct. App. 1997) (holding that a shelter hearing order pending adjudication of the factual allegations of a petition is not final).
[12] Utah Code Ann. § 78-3a-312(4)(f) (Supp. 2006).
[13] Utah Code Ann. § 78-3a-312(1)(a) (Supp. 2006).
[14] Id. § 78-3a-312(2)(a); State ex rel. J.H., 2006 UT App 205, ¶ 8, 138 P.3d 70.
[15] Utah Code Ann. § 78-3a-312(2)(b).
[16] Id. § 78-3a-312(4)(a); see also State ex rel. J.H., 2006 UT App 205, ¶ 8 ("[A] permanency hearing requires . . . either a determination that [a minor] could safely be returned to [the parent's] custody or an order terminating reunification services and setting a final permanency plan for [the minor]." (citing In re S.K., 1999 UT App 261, ¶ 12 n.5, 987 P.2d 616)).
[17] Utah Code Ann. § 78-3a-312(4)(d).
[18] See Utah Code Ann. § 78-3a-311(2)(f)(I) ("If reunification services are ordered, a permanency hearing shall be conducted by the court in accordance with Section 78-3a-312 at the expiration of the time period for reunification services.").
[19] See id. § 78-3a-312(2)(a).
[20] See State ex rel. J.J.T., 877 P.2d 161, 163-64 (Utah Ct. App. 1994) (asserting that because a child's environment is constantly evolving, a juvenile court may reweigh previously considered evidence in light of more recent events).
[21] Gerbich v. Numed, Inc., 1999 UT 37, ¶ 16, 977 P.2d 1205; accord Utah R. Civ. P. 61; Hardy v. Hardy, 776 P.2d 917, 924-25 (Utah Ct. App. 1989).
[22] Utah R. Juv. P. 20A(h).
[23] Id. 20A(h)(1) (second emphasis added).
[24] Id. (emphasis added).
[25] Id. 20A(h)(2) ("Termination of parental rights trials. Any person who has been identified as an expert whose opinions may be presented at the termination of parental rights trial must be disclosed by the party intending to present the witness at least thirty days prior to the trial or hearing unless modified by the court." (second emphasis added)).
[26] Compare id. 5(b) ("`Adjudication' means a finding by the court, incorporated in a judgment or decree, that the facts alleged in the petition have been proved."), with id. 5(g) ("`Petition' means the document containing the material facts and allegations upon which the court's jurisdiction is based."). See also Utah Code Ann. § 78-3a-103(1)(b) (Supp. 2006) (giving nearly identical definition of term "Adjudication" to that offered by the rules of juvenile procedure).
[27] See Utah Code Ann. § 78-3a-310(1) (2002); id. § 78-3a-118(2) (Supp. 2006).
[28] Utah R. Juv. P. 5(f).
[29] State ex rel. B.R., 2006 UT App 354, ¶ 27 n.9, 144 P.3d 231; see Utah Code Ann. § 78-3a-312 (Supp. 1995).
[30] See Utah Code Ann. §§ 78-3a-311 to -312 (Supp. 2006).
[31] State ex rel. J.H., 2006 UT App 205, ¶ 7, 138 P.3d 70 (internal quotation marks omitted).
[32] Utah R. Juv. P. 46(a).
[33] Id. 46(b).
[34] Utah Code Ann. § 78-3a-312(3) (Supp. 2006).
[35] See, e.g., Gerbich v. Numed, Inc., 1999 UT 37, ¶ 16, 977 P.2d 1205 ("This court will overturn a trial court ruling excluding a proffered witness if the appellant demonstrates that the trial court has overreached the broad discretion granted it and thereby affected the appellant's substantial rights.").
[36] Utah R. Juv. P. 46(a).
[37] See, e.g., State ex rel. K.M., 965 P.2d 576, 579 (Utah Ct. App. 1998) (noting in context of disposition review hearing that as a matter of due process, a party "must be given a reasonable opportunity to know the claims of the opposing party and to meet them" (internal quotation marks omitted)); State ex rel. W.S., 939 P.2d 196, 202 (Utah Ct. App. 1997) (commenting that "[n]ot only was it contrary to Rule 46 of the Utah Rules of Juvenile Procedure to deny appellant the right to testify and present evidence [at a disposition hearing], it also was a denial of due process" and holding that "[d]ue process requires that a parent be given a meaningful opportunity to be heard" (internal quotation marks omitted)).
[38] 830 P.2d 291, 296 (Utah Ct. App. 1992).
[39] See Utah R. Juv. P. 2(a) ("When the proceeding involves neglect, abuse, dependency, permanent deprivation of parental rights, adoption, status offenses or truancy, the Utah Rules of Civil Procedure shall apply unless inconsistent with these rules." (emphasis added)).
[40] See Berrett, 830 P.2d at 294-96 (reasoning that "the necessary prerequisite to the imposition of a [discovery] sanction is an order that brings the offender squarely within possible contempt of court" and holding that "absent an order creating a judicially imposed deadline, a trial court may not sanction a party by excluding its witnesses under rule 37(b)(2)" (citations and internal quotation marks omitted)).
[41] Rehn v. Rehn, 1999 UT App 41, ¶ 28, 974 P.2d 306; Utah R. Civ. P. 61.
[42] Jensen v. IHC Hosps., Inc., 2003 UT 51, ¶ 100, 82 P.3d 1076 (internal quotation marks omitted).