2025 UT App 17

# THE UTAH COURT OF APPEALS

IN THE INTEREST OF K.M.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

D.M. AND T.C.,
Appellants,
*v.*
M.M.,
Appellee.

Opinion
No. 20230945-CA
Filed February 13, 2025

Fourth District Juvenile Court, Provo Department
The Honorable Brent H. Bartholomew
No. 1140809

Caleb Proulx, Attorney for Appellants

Nathan R. Garcia, Attorney for Appellee

Martha Pierce, Alisha Giles, and Heath Haacke,
Guardians ad Litem

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

MORTENSEN, Judge:

¶1 Believing her grandson was in danger stemming from the mental instability of the boy's mother, a grandmother petitioned for a protective order seeking custody in July 2016. A juvenile court granted the temporary protective order. Months later, in February 2017, the boy's aunt filed a petition for guardianship, which the juvenile court granted on a temporary basis. The boy has been in his aunt's custody since. A great number of

proceedings followed, but ultimately the parents entered into a stipulated agreement with the aunt that gave the aunt temporary custody of the boy, provided for parent-time, and specifically set criteria that would provide an avenue for the parents to regain custody. Years later, when the father petitioned for a return of custody, the aunt responded by petitioning to make the guardianship permanent. Ultimately, a trial was held and the juvenile court, in the fall of 2023, granted the aunt permanent guardianship.

¶2    The parents appeal and claim several errors by the juvenile court. We hold that the juvenile court's findings failed to support either a conclusion that the boy could not be returned safely to his parents or, alternatively, that the father failed to substantially comply with the terms of the stipulated order. As a result, the aunt's petition for permanent guardianship should not have been granted and the father's petition to dissolve the temporary guardianship should not have been denied. Accordingly, we reverse.

BACKGROUND

¶3    KM (Child), who was born in early 2010, is currently nearly fifteen years old and is the son of TC (Mother) and DM (Father) (collectively, Parents).

¶4    In July 2016, when Child was about six years old, his maternal grandmother petitioned for a protective order seeking custody. The grandmother alleged that Mother's mental health issues were placing Child at risk of harm. In September 2016, the juvenile court entered a temporary protective order.

¶5    About seven months later, in February 2017, MM (Aunt), who is Child's maternal aunt, filed a petition for guardianship of Child. The juvenile court awarded Aunt temporary guardianship in March 2017. Mother and Father were present at the custody

proceeding but were unrepresented. Aunt's amended petition, filed in April 2017, alleged that Mother had "failed to comply with the requirements suggested by the guardian ad litem and ordered" by the juvenile court. Aunt also alleged that Mother "exhibited serious" mental health issues that "posed a serious danger" to Child. Specifically, Aunt alleged that Mother had refused to "comply with prescribed treatment plans" to address her mental health issues, that she was subjecting Child to dangerous conditions, that she was neglecting Child's basic needs, and that she had left Child unattended at a park. Aunt also identified multiple criminal charges that Mother and Father had accumulated. Child was residing with Aunt by the time the amended petition was filed, in which she specifically requested the court grant physical custody and guardianship of Child to her.

¶6    A few weeks after Aunt filed the amended petition, the juvenile court entered a default judgment against Mother in response to Aunt's petition, granting Aunt permanent custody and guardianship of Child due to Parents' failure to attend the scheduled mediation. But just five days after entry of the default judgment, Parents appeared before the juvenile court—without legal representation—and requested the judgment be set aside. In addition, Father submitted a declaration of paternity. The juvenile court granted the request to set aside the default and scheduled the matter for trial.

¶7    In late May 2017, while still acting pro se, Parents entered into a stipulated agreement concerning Aunt's petition. They consented to grant Aunt temporary custody and guardianship of Child for one year. Following this one-year period, Parents could petition the juvenile court for a review of the custody and guardianship order, subject to the following criteria:

  a.  Parents must resolve all criminal charges, avoid any new charges, and comply with parole requirements;

> b. Parents must receive mental health assessments and comply with any recommended treatment plans;
>
> c. Parents must provide proof of a stable living environment and income;
>
> d. Parents must abstain from all substances that are not legally prescribed;
>
> e. Parents must sign the necessary releases to allow verification of these goals.

The agreement also provided that Mother and Father were to have, at minimum, supervised parent-time twice a week for three hours. There's no indication in the record that provisions were made to furnish Parents with legal representation, caseworker assistance, or support from the Division of Child and Family Services (DCFS) to help them fulfill the requirements set forth in the agreement. On the same day, the juvenile court accepted the stipulation, adjudicated Child as dependent, and incorporated the terms of the stipulation into an order.

¶8 After the adjudication, Father appears to have encountered obstacles exercising his parent-time with Child. In March 2018, Father—still acting pro se—filed a motion to enforce the court's order concerning parent-time, alleging that his visits were being denied or canceled by Aunt. In response, the juvenile court ordered that Child participate in individual therapy and that Parents receive their parent-time.

¶9 In April 2018, nearly a year after adjudication, Father, still acting pro se, submitted multiple letters to the juvenile court demonstrating his compliance with the court's order to address the issues identified at disposition. Specifically, Father provided a letter from his probation officer confirming that he had successfully completed probation—including substance abuse treatment—and was a model probationer, a letter from his treatment provider stating he had completed substance abuse

treatment in January 2018, a letter from October 2017 verifying his successful completion of domestic violence treatment, and documentation of his income.

¶10    In July 2018, Father, now represented by counsel, again raised concerns about Aunt's failure to provide parent-time and requested that the court lift the requirement for supervised visits. In response, the juvenile court ordered that supervised parent-time should continue "individually for both parents" while the court awaited input from Child's therapist. A few weeks later, the therapist submitted an email to the court stating that Child "enjoyed" his visits with Parents and had not reported any problems. In addition, the therapist said Child reported wanting "to have more time with his dad on the visits." The juvenile court nevertheless decided to continue requiring that visits with Parents be supervised.

¶11    In November 2018, Father, again acting pro se, filed a motion to "terminate guardianship," in which he asserted that he was "withdrawing [his] consent to the guardianship appointed to" Aunt. Father attached a rental agreement as proof that he and Mother had stable housing. Father also attached a statement in which he alleged Aunt was not allowing him to exercise his parent-time or talk to Child. In January 2019, the juvenile court denied Father's motion, stating that a petition to modify, rather than simply a motion, "must be filed in order to give opposing parties the chance to respond, to allow for mediation and discovery, and for a trial to take place."

¶12    About three months later, in April 2019, the juvenile court ordered unsupervised parent-time for Parents. Later, in May 2019, the juvenile court directed Parents to submit to a hair follicle test for illegal substances, indicating that if the results were negative, overnight visits with Child would begin immediately and if the results were positive, overnight visits would begin thirty days

later. The record is unclear if or when this provision was triggered.

¶13    The next hearing occurred over a year later, in September 2020, after Aunt raised a concern about Parents missing a drug test in July 2020. The juvenile court ordered Parents to complete another hair follicle test. At a follow-up hearing held a few weeks later, it was revealed that Mother's drug test was negative but Father's was positive for marijuana. However, Father submitted a medical cannabis card to the court.

¶14    Around two weeks later, in early October 2020, Father, acting pro se, filed a petition to terminate Aunt's temporary custody and guardianship of Child. He attached numerous documents (completion of probation and therapy, employment records, and proof of housing) to address the concerns outlined in the disposition order. Aunt filed her response to Father's petition along with a counter-petition seeking to terminate Parents' parental rights.

¶15    In early November 2020, Aunt filed a separate petition to terminate Parents' parental rights—despite the ongoing disposition proceedings related to Aunt's April 2017 guardianship petition. A pre-trial hearing was held the same day to address the appointment of counsel in light of Aunt's petition to terminate parental rights, and counsel was appointed to represent Father. A month later, counsel was appointed for Mother.

¶16    In March 2021, Aunt sought permission to amend her petition to terminate parental rights to instead request permanent custody and guardianship of Child. The juvenile court granted this motion. A few weeks later, in late May 2021, Aunt filed a motion to appoint a custody evaluator. Then, in August 2021, Aunt formally withdrew her petition to terminate parental rights. Given the withdrawal of the petition to terminate, the juvenile court ultimately vacated the appointment of counsel for Parents.

New counsel then filed an appearance on behalf of both Parents. In October 2021, the juvenile court granted Aunt's motion to appoint a custody evaluator.

¶17 In July 2022, after several delays involving the custody evaluation, Aunt and Parents entered into a stipulation to provide a means for Parents to regain custody of Child based on implementing the custody evaluator's recommendations. The benchmarks that the custody evaluator set included ensuring Child attended school and completed schoolwork, Parents showing adequate housing and predictable income, Parents completing drug testing, Mother participating in psychological services, and Mother signing appropriate releases of information to allow her therapist to speak with the custody evaluator. Significantly, the stipulation provided that "Mother and Father will cooperate with DCFS to determine if DCFS can appropriately provide an IHS (in-home services case) that will support Mother and Father's compliance with the benchmarks and conditions set forth" in the stipulation. It further provided that "all parties will be given an opportunity to propose or provide feedback on any elements of the IHS prior to finalizing said plan" and that the "elements of the IHS plan must support Mother and Father in accomplishing the conditions set forth [in the stipulation] and not be unduly burdensome or duplicative of the conditions." An evaluation would take place at the end of the coming school year to determine if Parents had met the benchmarks sufficiently to regain custody of Child. The juvenile court found the agreement to be in Child's best interest and incorporated it (including the provision for services from DCFS) into an order in August 2022.

¶18 The juvenile court held an evidentiary hearing in early August 2023 to determine the best permanency outcome for Child. Notably, at this hearing, the court heard testimony that Child enjoyed spending time with his younger siblings when he

visited Parents' home.[1] A few weeks later, the court issued an order granting Aunt permanent custody and guardianship and denying Parents' request that custody be restored to them. Parents filed a motion for relief from the order and for additional findings. The juvenile court subsequently entered an amended order for permanent custody and guardianship in favor of Aunt.

¶19 The juvenile court identified the following factors as "leading to" custody and guardianship with Aunt:

1. Criminal activity: The court determined that Parents "seem to have abandoned their lives of crime" and that there were "no current outstanding criminal charges and sentences that should deprive [Parents] from being able to raise their son."

2. Domestic violence: The court noted that Parents had completed domestic violence treatment and that there had been "no apparent incidents of domestic violence since that which generated the necessity of having the minor child be cared for by Aunt."

3. Illegal drug use: The court determined that Father had satisfactorily "completed the agreed upon" drug testing. Mother, "however, successfully completed one test but failed to undergo the second stipulated test, giving the excuse that she did not want any more of her hair removed." The court interpreted this unwillingness "either as an indication of her having used substances or a disinterest in regaining custody of her son."

4. Income and housing instability: The court determined that Parents had sufficient resources "to meet their current needs and that of the children who are now with them."

---

1. Parents have several other children together that are younger than Child.

But the court was "uncertain whether they can adequately support [Child's] financial needs if he was returned to their full-time custody." The court was also troubled that Parents had been in their current home for a short period of time.

5. Mother's mental illness: The court was concerned that "Mother attended less than half of the recommended therapy sessions" and that "she did not sign and provide a release of information so her therapist could talk with [the custody evaluator] about the feasibility of [Child] returning to Parents' care." The court concluded that, given this condition, the custody evaluator "did not have adequate information regarding Mother's therapeutic care to provide expert opinion to the court about her current mental state."

6. Child's educational progress: While Child's progress was deemed "acceptable" by the custody evaluator, the court viewed it as "subpar and far below [Child's] potential." The court speculated that a "possible explanation for this less-than-stellar school year was [Child] living for part of the time with [Parents] in a home that was outside the school district, and he lived for some of the time with Aunt." The court acknowledged, however, that the newness of attending junior high might also explain his educational underachievement. The court concluded that having him attend school from one home would help improve his educational progress.

7. Medical and dental care: The court determined that because Parents "forgot about scheduled appointments," they had "shown the court that they either are unwilling or unable to provide essential medical and dental care to their son even though he is covered by insurance."

8. Child's desire: The court acknowledged that it was "clear" that Child wanted to "live primarily with" Parents. But the court stated that Child's wishes "are not controlling, being simply one factor it must consider in deciding whether to reunify him with Parents." Instead, the court said it had to evaluate what was in the best interest of Child. The court noted that Aunt had provided Child with safety and stability for over six years, saw to his necessities and educational needs, and had "done all this out of the goodness of her heart, thereby demonstrating the love she has for" Child. In contrast, the court observed that Parents had "failed to reach the thresholds they agreed to for the court to consider returning their son to them." Given this disparity, the court determined that it could not "honor [Child's] wishes because doing so in the court's view would be contrary to his best interests of providing him with adequate stable, safe, and consistent primary care that he needs to thrive."

¶20 In sum, the juvenile court concluded that Parents' success in leaving behind criminal activity, completing domestic violence treatment, and finding stable employment was "[overshadowed] by what they have not done" in the "over six years" they had "to remedy the situation that led to their son being cared for outside their home." The three factors that appear to have most troubled the court were housing—because Parents had only recently signed a one-year lease—Mother refusing to take the second drug test, and Mother not completing her mental health treatment. Notably, Parents were awarded parent-time with Child. However, the court ordered that Mother's parent-time was to be supervised by Father until she could demonstrate abstinence from illicit substances and address her mental health issues.

¶21 Parents appealed in October 2023, and the guardian ad litem (GAL) subsequently requested a hearing on Parents' motion for relief from the juvenile court's order granting Aunt permanent

custody and guardianship. In anticipation of this hearing, the juvenile court interviewed Child near the end of January 2024.

¶22 The hearing requested by the GAL occurred a few days after the interview. Before arguments were made on Parents' motion, the juvenile court distributed a "Proposal" that provided "a way to rescind the permanent custody and guardianship awarded to [Aunt] and give [Parents] one last chance to regain custody" of Child. The Proposal had provisions for drug testing, Child's medical and dental care, verification of income and housing, completion of therapy, Child's academic progress, parent-time, and child support. The Proposal stated that "a final hearing [would be held] in six months to determine" if Child should be returned to custody of Parents or if Aunt should be awarded permanent custody. The Proposal also stated that if "the parties accept the foregoing proposal, the current appeal will be dismissed so all can focus on what they have agreed to." The court gave them one week to discuss the Proposal.

¶23 Aunt and Parents apparently could not agree on the Proposal. The minute entry simply states that counsel reported "there [would] likely not be an agreement." And in February 2024, the court issued a written decision denying Parents' motion for relief and their request for additional findings.

ISSUES AND STANDARDS OF REVIEW

¶24 Determinative in this appeal is Parents' assertion that the juvenile court applied the incorrect standard for reunification services. "Whether the juvenile court applied the appropriate legal standard [in a custody hearing] is a question of law that we review for correctness." *In re S.M.*, 2007 UT 21, ¶ 15, 154 P.3d 835; *see also In re C.C.*, 2013 UT 26, ¶ 12, 301 P.3d 1000; *In re adoption of B.T.D.*, 2003 UT App 99, ¶ 13, 68 P.3d 1021; *In re H.R.V.*, 906 P.2d 913, 915 (Utah Ct. App. 1995). Relatedly, Parents claim that the juvenile court abused its discretion in rejecting the evidence that

Parents had "long remedied the circumstances that led to the 2017 temporary guardianship." We review a juvenile court's factual findings supporting a conclusion that parents failed to meet the requirements of a service plan under the clearly erroneous standard. *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680.[2]

ANALYSIS

I. The Correct Standard for Reunification Services

¶25 Parents and the GAL assert that the juvenile court applied the wrong standard in determining whether Parents could be reunified with Child. To be frank, it's not entirely clear what standard the juvenile court applied—apart from a general best interest analysis—in reaching its decision as a standard was never articulated. But given the procedural disposition of this case, the court arguably should have been guided by this standard: whether Child could safely be returned to the care of Parents. And it's clear to us that this was not the standard applied by the juvenile court when it made its custody determination.

¶26 As we have laid out, in May 2017, Parents entered into a stipulated agreement concerning Aunt's petition for custody and guardianship. In the agreement, Parents consented to grant Aunt temporary custody and guardianship of Child for one year. Following this time, Parents would be allowed to petition the juvenile court for review of the guardianship arrangement if they

___

2. Parents also claim on appeal that the juvenile court erred in failing to recognize that Child's "fundamental right to family life is a source of an independent presumption that a child should be raised in the custody of fit parents." Parents further assert that the juvenile court abused "its discretion in failing to give [Child's] wishes dispositive weight." Due to our resolution on other grounds that the order of guardianship must be reversed, we need not address these questions.

proved compliance with certain conditions that would ensure the safety of Child. The juvenile court accepted this agreement, adjudicated Child as dependent, and incorporated the terms of the stipulation into an order. *See supra* ¶ 7.

¶27 We understand the juvenile court's incorporation of the stipulation's terms by which Parents could petition for review of Aunt's temporary guardianship to be an order of reunification services.[3] After all, the stipulation listed a set of conditions Parents were to meet, in the judgment of the juvenile court, in order to regain custody of Child. Significantly, the second stipulation that incorporated the recommendations of the custody evaluator and that was adopted by the court specifically stated Mother and Father were to "cooperate with DCFS to determine if DCFS can appropriately provide an IHS (in-home services case) that will support Mother and Father's compliance with the benchmarks and conditions set forth" in the stipulation, specifically noting the "elements of the IHS plan must support Mother and Father in accomplishing the conditions set forth [in the stipulation] and not be unduly burdensome or duplicative of the conditions." *See* Utah Code § 80-3-406 (addressing reunification services a juvenile court offers in the context of a permanency plan).

¶28 When reunification services are offered, the juvenile court must ultimately determine "whether the minor may safely be returned to the custody of the minor's parent." *See id.* § 80-3-

---

3. Aunt concedes as much in her brief: "While reunification services were not offered in this case, there were stipulated conditions upon which [Parents] needed to meet to regain custody of [Child] which were akin to reunification services. These stipulated conditions were not simply recommendations but were incorporated into a specific order which was adopted and agreed to in [Child's] 'best interest.'"

409(2)(a).[4] In making this "determination, . . . the juvenile court shall . . . review and consider," among other information, "any admissible evidence offered by the minor's attorney guardian ad litem" and "any evidence regarding the efforts or progress demonstrated by the parent." *Id.* § 80-3-409(3). The failure of the parent to "participate in a court approved child and family plan" constitutes "[p]rima facie evidence that return of the minor to a parent or guardian would create a substantial risk of detriment to the minor." *Id.* § 80-3-409(2)(c).

¶29    The juvenile court failed to properly apply this standard when it awarded permanent custody and guardianship to Aunt. Indeed, the juvenile court did not purport to be applying this standard, and the clear weight of the evidence indicated that Parents were at least minimally fit and had remedied the safety issues that led to Child being placed in the temporary custody of Aunt. Parents were clearly participating "in a court approved child and family plan." *Id.* And while they were admittedly not following that plan to the letter, they had, considering all the evidence, demonstrated that Child could safely be returned to their custody. *See id.* § 80-3-409(2).

¶30    We now address each of the safety issues in turn.[5]

---

4. Under Utah Code section 80-3-409(1)(a), a permanency hearing is to take place no later than twelve months after the minor is removed from the home.

5. In doing so, we observe that the juvenile court's analysis of these factors exceeded the scope of the actual benchmarks from the custody evaluator that the court adopted in its order. *See supra* ¶ 17. For example, the benchmarks make no mention of dental or medical care, and they required only that Parents secure "more adequate housing arrangements (at least a 3-bedroom dwelling)."

¶31 **Criminal activity.** Parents were required to resolve all criminal charges and avoid new criminal charges. They appear to have done so to the court's satisfaction. Indeed, the court determined that Parents had "abandoned their lives of crime" and that there were "no current outstanding criminal charges" or "sentences" that would deprive them of being able to raise Child. Thus, there was no evidence that criminal activity of Parents threatened the safety of Child.

¶32 **Domestic violence.** The court also acknowledged that issues surrounding domestic violence had been addressed. There was no evidence of ongoing safety concerns related to this factor.

¶33 **Illegal drug use.** While the court states that Father had satisfactorily "completed the agreed upon" drug testing, it noted that Mother had failed to undergo the second agreed-upon test because she didn't want any more of her hair removed. The court interpreted this refusal as an "indication" of Mother "having used substances or a disinterest in regaining custody" of Child. This conclusion was against the clear weight of the evidence. As to the court's first conclusion (namely, that Mother was using illegal substances), the evidence showed that Mother was receiving an opiate blocker as part of her treatment. To qualify for the program that provided the opiate blocker, Mother was required to complete a monthly drug test. In fact, when asked if she was concerned that not taking the hair follicle test might be "potentially indicative" that she was being "evasive," Mother testified that she was not concerned about that possibility because she was already taking "so many different drug tests . . . throughout the month." In a like manner, the custody evaluator stated that Mother's failure to complete the hair follicle test "concern[ed] [him] less" because the other drug tests she was required to take as part of her treatment "demonstrate[ed] that she [had] likely remained sober." So, contrary to the court's conclusion, the clear weight of the evidence was that Mother had not used illegal substances for a long period of time. As to the

court's second conclusion, the evidence very much demonstrated an interest in regaining custody of Child. Indeed, Mother was clear that she enjoyed her time with Child and wanted to spend more time with him. In any case, there is no evidence that Mother's failure to complete the second hair follicle test raised a legitimate safety concern.

¶34 **Housing and income.** The court was skeptical that Parents could "adequately support [Child's] financial needs if he was returned to their full-time custody." And the court stated that "it remains to be seen whether they can remain in their home throughout the remainder of their one-year lease." But neither of these circumstances, apart from sheer speculation, indicate that the situation was presently unsafe or unsuitable for Child.

¶35 **Mother's completion of therapy.** The court expressed concern that Mother had missed a significant number of her therapy sessions and failed to sign a release of information to allow the custody evaluator and her therapist to discuss the feasibility of Child returning to Parents' care. These are legitimate concerns, but they do not necessarily relate to the safety of Child, especially when considered alongside the additional evidence presented. In fact, the court found that the custody evaluator "did not have adequate information regarding Mother's therapeutic care to provide expert opinion to the court about her current mental state." And the court found that the custody evaluator testified if Mother "had experienced a psychotic break," her delusions "seem[ed] to have stopped" by the time of the evidentiary hearing. In fact, the custody evaluator testified that while Mother did appear to have "some significant mental health issues," he acknowledged that his assessment of her condition was "somewhat of a triage diagnosis as opposed to . . . an in-depth analysis." However, the evaluator testified that "despite [his] concern about her mental health, the best evidence that we have suggests that she's able to adequately care for her own children." And when asked if he felt "comfortable stating that both . . . the

natural parents would be adequately able to parent the children they have right now," the custody evaluator responded, "Yes." When asked if this opinion extended to Child, the evaluator said that it did. In addition, Aunt testified (at the same permanency hearing in August 2023) that the last time she had witnessed Mother have a mental health episode was "the very beginning of 2017." Given this testimony, the juvenile court failed to make any finding that Mother's mental health—based on the evidence received at the permanency hearing—impacted her present ability to care for Child or created a safety issue that would prevent Child from returning to the care of Parents.

¶36  **Medical and dental care.** While the court did make a finding that Parents "forgot about scheduled appointments," it did not articulate how this failure prevented Child from safely returning home. While we certainly agree that routine medical and dental care is essential for a young person, we are hard-pressed to see how missed appointments could not be addressed by simple interventions provided through support services.

¶37  **Child's educational progress.** The juvenile court also made findings about what it characterized as Child's "subpar" academic progress. But it equivocated about the cause, and it never articulated how this factor amounted to a safety concern.

¶38  Rather than looking to whether Child could safely return home, it appears that the juvenile court defaulted to awarding permanent custody and guardianship to Aunt. The court stated, "The . . . award of permanent custody and guardianship of [Child] to [Aunt] neither severs his relationship nor stops him from interacting with [Parents] and siblings. Terminating Parents' rights would do that, but such action would likely be detrimental to [Child] and not in his best interests." To be clear, there was no petition to terminate Parents' rights after Aunt withdrew her (apparently ill-conceived) petition to that effect. So we are confused as to why the juvenile court drew this distinction in its

analysis. The choice was not between termination of parental rights and permanent custody with Aunt. Rather, this matter was before the juvenile court on Aunt's petition for permanent custody and guardianship and Parents' related petition to terminate Aunt's temporary guardianship. Simply put, there should not have been talk of termination of parental rights at this point in the proceeding. The proper standard was whether the clear weight of the evidence supported that Child could safely return to the custody of Parents.

¶39    Finally, insofar as the court had ongoing concerns about whether Parents would follow through on providing appropriate housing, arranging medical and dental care, monitoring of Child's academic progress, and completing therapy, it could have ordered support services along with restoring custody to parents, as it is clearly allowed to do. *See* Utah Code § 80-3-409(9) ("The juvenile court may, in the juvenile court's discretion . . . enter any additional order that the juvenile court determines to be in the best interest of the minor . . . or . . . order [DCFS] to provide protective supervision or other services to a minor and the minor's family after [DCFS's] custody of a minor is terminated."). The juvenile court has ongoing jurisdiction over Child. *See In re M.J.*, 2011 UT App 398, ¶ 49, 266 P.3d 850 ("Once the juvenile court has adjudicated the child as falling under its jurisdiction, it has ongoing jurisdiction over that child."); *see also* Utah Code § 78A-6-120(1). With that authority, the court could have ordered DCFS to assign a caseworker to assist Parents in budgeting, obtaining available public assistance, monitoring Child's educational progress, and ensuring Child receives proper medical and dental care. The caseworker could also have acted as a liaison between Mother and her therapists. The juvenile court could have scheduled regular reviews until it was satisfied that Parents no longer needed such support.

¶40    In sum, we conclude that the evidence only supports a conclusion that Child could be returned to his Parents safely, the

petition for permanent guardianship should have been denied, and the juvenile court's determination to the contrary was the result of applying an incorrect standard. Therefore, the order granting permanent guardianship to Aunt is reversed, as is the order denying Father's petition to dissolve the temporary guardianship.

## II. Compliance with the Order

¶41 Although Parents have brought this appeal jointly, they still remain separate and distinct parties. Moreover, the rights that they assert are individual. Indeed, "it is axiomatic that once a child is placed [in a temporary guardianship] due to the abuse or neglect of the child's parents, it is incumbent upon each parent, *individually*, to take those steps necessary to cure the problems that led to the loss of his or her custody. One parent's success or failure does not necessarily affect the success or failure of the other parent." *In re A.M.*, 2012 UT App 115, ¶ 4, 280 P.3d 422 (per curiam) (emphasis added). This means that "it is entirely possible that one parent may successfully regain custody of the child," while the other parent does not. *Id.* Accordingly, in reviewing the decision of whether the permanent guardianship was properly granted, we must review the juvenile court's findings and weigh them against its conclusion as to each parent individually. The GAL asserts that Father substantially complied with the juvenile court's order, and we agree. On this independent basis, the juvenile court should have denied Aunt's petition for permanent guardianship and returned Child to Father.

¶42 Here, the juvenile court found that, as to criminal activity and domestic violence, Father (actually, both Parents) had resolved the court's concerns. Concerning drug testing, while the court found Mother non-compliant due to a single missed drug test, the court expressly found that Father was completely compliant. The court's concerns regarding Mother's mental illness did not touch upon Father's compliance with the order. Indeed,

as outlined above, at a certain point the court established Father as the proper person to supervise Mother's visitation.

¶43    As to income and housing, the order required that Parents provide proof of a stable living environment and income. The court found that Parents had sufficient resources to meet their current needs and that Parents had adequate housing. While the court expressed uncertainty about whether their resources were sufficient for an additional child, the court did not find that this requirement was lacking. And while the court expressed that it was troubled that their current living situation had only existed for a short period of time, the court did not find that Parents had failed to meet this condition. In all of these particulars, the court found no lack of compliance on Father's part.

¶44    As to Child's educational progress, the court did not make a finding of failure to comply with the order. In fact, the order had requirements only about attendance, tardiness, and the completion of homework. It did not touch on any measures of academic success, such as grades. Instead of focusing on the benchmarks, the court found that any "less-than-stellar" performance in school could be explained by living at multiple homes and the common stresses of entering junior high. The court surmised that attending school from one home would help improve his educational progress. Accordingly, this is a neutral finding and not one that can be held against either Mother or Father, especially given that the court's analysis appears to have exceeded the scope of the stipulated benchmark.

¶45    The only possible item of non-compliance is the court's finding that Parents forgetting about scheduled appointments with doctors or dentists showed an inability to provide essential medical and dental care. Notably, this factor was not among the stipulated benchmarks, so we are hard-pressed to see the justification for requiring Parents to comply with it at all, let alone so strictly. We therefore conclude that this sole finding, especially

vis-à-vis Father, is insufficient to establish non-compliance with the stipulated order or to provide a basis to grant the petition for permanent guardianship.

¶46 On an ancillary note, once the juvenile court had determined Father substantially complied with the stipulated order, Mother's compliance with that same order—at least insofar as granting permanent custody to Aunt was concerned—was a non-issue. In other words, addressing Mother's right to reunification was essentially rendered moot by the court's determination that Father had complied with the provisions of the stipulated order. *See State v. Steed*, 2015 UT 76, ¶ 6, 357 P.3d 547 ("An appeal is moot if the controversy is eliminated such that it renders the relief requested impossible or of no legal effect." (cleaned up)); *see also In re D.A.T.R.*, 2024 UT App 185, ¶ 34 ("The defining feature of a moot controversy is the lack of capacity for the court to order a remedy that will have a meaningful impact on the practical positions of the parties." (cleaned up)). Thus, we alternatively conclude that since Father substantially complied with the provisions of the stipulated order as adopted by the court, there was no basis to award permanent guardianship to Aunt and the motion to terminate temporary guardianship should have been granted.

CONCLUSION

¶47 We reverse the award of permanent custody and guardianship to Aunt as well as the denial of Father's petition to dissolve the temporary guardianship. We hold that the juvenile court's findings do not support a conclusion that Child could not be returned safely to Parents. Alternatively, Father substantially complied with the terms of the stipulated order. As a result, Child should have been reunified with his Father, with the issue of Mother's right to reunification thereby being rendered moot insofar as Aunt's petition was concerned.