**2016 UT App 147**

## THE UTAH COURT OF APPEALS

IN THE INTEREST OF G.J.C.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

D.D.B.,
Appellant,
*v.*
J.L.C.,
Appellee.

Opinion
No. 20150432-CA
Filed July 14, 2016

First District Juvenile Court, Brigham Department
The Honorable Angela Fonnesbeck
No. 1083532

Paul W. Mortensen, Attorney for Appellant

J.L.C., Appellee Pro Se

Martha Pierce, Guardian ad Litem

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and STEPHEN L. ROTH concurred.

TOOMEY, Judge:

¶1     The primary issue in this appeal is whether the juvenile court improperly denied D.D.B.'s (Mother) petition to terminate J.L.C.'s (Father) parental rights to their son, G.J.C. (Child). Because we conclude the court's decision regarding Child's best interest was against the clear weight of the evidence, we reverse its order and remand for the juvenile court to enter an order terminating Father's parental rights.

BACKGROUND

¶2    Child was born in March 2008 while the parties were married. But they separated in June 2009, and Mother filed for divorce one month later. Stipulated orders from the divorce court granted Mother sole physical custody of Child and granted Father the minimum statutory parent-time. Since the parties' separation, Child and Mother have continuously lived with Mother's parents.

¶3    In November 2009, Mother obtained a permanent protective order against Father based on threats he made against Mother and her parents. This protective order allowed Father to maintain his parent-time schedule with Child but required him to arrange for third parties to assist with exchanging Child. The order also limited Father's communications with Mother to only those regarding Child.

¶4    Upset with the parent-time arrangements, between November 2009 and October 2010, Father repeatedly violated the provisions of the court's orders by threatening Mother and refusing to return Child to her for days or weeks. In particular, in July 2010, Father refused to return Child to Mother following a visit, and Mother's attorney reminded Father of the court-ordered parent-time schedule.[1] Father responded to Mother's attorney via text message, "This approach may cost your family and hers more than your willing to wager its not a smart move to try and corner a resourceful man." Mother and her attorney reported Father's threats to law enforcement officials.

¶5    On August 10, 2010, Father again refused to return Child to Mother, but nevertheless he appeared at a hearing regarding the parties' divorce on August 18. At the hearing, the court commissioner declared that Father's messages to Mother's

---

1. Father was unrepresented by counsel at the time.

attorney could only be construed as a threat against the attorney and his family and ordered Father to "immediately cease all threatening communications." The court also certified to the district court issues of contempt of court against Father for, among other things, his refusal to pay child support. Finally, the commissioner ordered Father to inform the court of Child's whereabouts. Father stated that Child was with Father's mother. The court then ordered Father to wait at the court while law enforcement officers accompanied Mother to Father's mother's home to retrieve Child. Father was later convicted of criminal custodial interference for his actions related to this incident.

¶6     In September 2010, Father again refused to return Child to Mother, demanding to speak personally with Mother. Although Mother pleaded for Child's return, by October 2, Father still had not returned Child to Mother. Instead, he left her a menacing voicemail in which she could hear him telling Child, who was crying in the background, "Tell your mommy to come get you." Mother then applied for a writ of assistance to receive law enforcement's help to get Child. But the next day, October 6, before the writ of assistance had been delivered to law enforcement, Father called Mother's parents to tell them he would return Child at an arranged location.

¶7     But instead of returning Child, Father left him with Father's sister and drove alone to the agreed-upon location. Mother's parents left Mother at a nearby store, and, when they arrived at the location, Father jumped in their car and demanded they take him to Mother. According to Mother's parents, Father threatened them with a handgun and threatened to shoot them if they did not comply. They refused. At a stop sign, Mother's mother jumped out of the car. Father also exited the car and threatened to shoot her if she did not return to the car. She ran away. Father got back into the car and had Mother's father return them to the prior location, where he fled the scene. Father was later apprehended in Wendover, Nevada, and charged with

two counts of kidnapping. Law enforcement officers found Child with Father's sister, and he was returned to Mother.

¶8      In addition to his previous protective order violations, by June 2011, while he was out of jail on bail, Father was arrested and charged with several new criminal offenses, including criminal custodial interference, driving with a measurable controlled substance, and reckless driving. Father also failed to follow through with Adult Probation and Parole (AP&P) reporting requirements and tested positive for methamphetamines.

¶9      In December 2011, Father pleaded guilty to reduced charges of attempted kidnapping. After pleading guilty, Father failed to report to AP&P for his presentence interview and failed to appear for his sentencing. Law enforcement officers later arrested him and held him in jail until March 2012, at which time Father was committed to the Utah State Prison for two concurrent zero-to-five-year sentences for the attempted kidnapping convictions.

¶10     In May 2014, Mother filed a petition to terminate Father's parental rights to Child on the grounds that Father was unfit and that termination would be in Child's best interest.[2] At the termination trial in January 2015, the juvenile court heard testimony from Mother, Father, Mother's parents, Father's mother, Mother's mental health counselor, Mother's prior attorney, and a probation officer. In particular, Mother testified that early in their marriage Father became violent and had outbursts of anger, and that she divorced him because of his drug abuse. Although she did not contact the Division of Child and Family Services to perform a welfare check, she testified that

_____

2. This was Mother's second petition to terminate Father's parental rights. She filed a similar petition in April 2013, but that petition was voluntarily dismissed.

she often had concerns for Child's welfare when he was with Father because she believed Father was neglectful when he was using drugs. Importantly, she expressed that she was especially worried about Child's safety once Father is released from prison, and stated, "I don't think that that is very safe for my child." But she also testified that she felt that all Father's anger was directed at her. Mother further testified that although Father sent Child cards from prison, she has kept them from Child because she believed he is better off without Father.

¶11 Father, representing himself, cross-examined each witness and testified on his own behalf. He conceded that until the fall of 2010, he had paid only approximately $1,000 of the nearly $20,000 he owed in child support. Father also testified that he had been expelled from the prison drug treatment programs three times and had no intention of going back because he did not go to prison for drug issues and didn't feel that the treatment was "beneficial." He further conceded that he had an extensive criminal history and since being incarcerated had been found in violation of a number of prison rules. With regard to his violations of the parent-time order, Father testified that he believed he was being "railroaded" by the court and that he had not violated the terms of his parent-time because he was allowed to keep Child for longer visits for statutorily allowed summer vacation. With regard to the kidnapping and other threats, when asked questions, Father either invoked his right not to incriminate himself further[3] or minimized his conduct, reasoning that his threats were "simply words," "there's no physical abuse," and "[he's] never put hands on any of them."

¶12 Mother's parents testified about their relationship with Child and about the October 2010 kidnapping. Specifically,

_____

3. It is not clear whether Father was entitled to invoke a Fifth Amendment right, but it is not disputed on appeal and we do not address it.

Mother's father testified he had often facilitated the exchange of Child between Mother and Father, but had to stop because it was too hard to watch Child "scream and cry" when he had to visit Father. He also testified that he paid for Mother and Child to have private security to protect them from Father. Finally, Mother's father testified he believed that since the parties' separation he has acted as Child's father because Child lives with him and that he took care of Child's emotional and financial needs. Mother's parents each testified that they had the financial ability to continue to help care for Mother and Child, that Child is a happy and well-adjusted child, and that they believed permanency would be best for Child. Mother's mother also testified about her experience during the attempted kidnapping. She recalled that Father was upset, took their cellphones, and wanted them to take him to see Mother, but they refused because it was in violation of a protective order. She further testified that, when she jumped out of the car, Father pointed a gun inches from her face and stated, "'Get back in the car or, I swear to God, I'll blow your . . . brains all over the sidewalk.'"

¶13 Mother's mental health counselor testified that, based on Father's criminal behavior and Mother's descriptions of his conduct, Father likely met the criteria for antisocial personality disorder, which could negatively affect Child. Father's supervising probation officer at AP&P testified that after supervising Father between August 2011 and March 2012 he believed Father lacked accountability and did not appreciate the severity of his crimes.

¶14 Finally, Father's mother testified about her relationship with Child and her son. She testified that, despite many attempts to contact Mother after the kidnapping, Mother refused to communicate with her or let her visit Child. She explained she thought there was "no logical explanation" for not letting Child visit with her, because she was unaware of and had nothing to do with her son's criminal activity. Father's mother also testified

that Child idolized Father and would "light up" when Father was around. She testified she tried to petition for grandparent visitation rights, but the attorney she hired did not help her very well. Mostly, she recalled the activities she used to do with Child and testified about how she loved Child and wanted to spend time with him.

¶15   Although the juvenile court found five grounds for termination, it ultimately determined that termination of Father's parental rights was not in Child's best interest. Mother appeals.

ANALYSIS

¶16   On appeal, Mother raises several issues, challenging the juvenile court's determination that not terminating Father's parental rights is in Child's best interest. In particular, she argues that the court's decision was clearly erroneous and against the clear weight of the evidence. Child's guardian ad litem similarly argues that the juvenile court's oral and written findings are correct, but that "as they stand, [the findings] can support only a best-interest determination" that termination is appropriate. According to the guardian ad litem, the juvenile court "erred in its choice of findings to rely on" by relying solely on "inappropriate factors" in its best interest analysis, including "Mother's single status, Mother having once relied on state assistance, [Child's] lack of detriment or damage, grandparent visitation, and actions taken earlier by the divorce court." Because we agree and determine that these issues are dispositive, we do not address Mother's other arguments further.

¶17   "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high

degree of deference." *Id.* "Thus, in order to overturn the juvenile court's decision '[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made.'" *Id.* (alteration in original) (quoting *In re Z.D.*, 2006 UT 54, ¶¶ 33, 40, 147 P.3d 401). Further, "[w]hen a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

¶18 "Utah law requires a court to make two distinct findings before terminating a parent–child relationship." *In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118. "First, the court must find that the parent is below some minimum threshold of fitness, such as a finding that a parent is unfit or incompetent based on any of the grounds for termination under [Utah Code section 78A-6-507]." *Id.* (citation and internal quotation marks omitted); *accord* Utah Code Ann. § 78A-6-507 (LexisNexis 2012) (providing the juvenile court the authority to "terminate all parental rights with respect to a parent if the court finds any one" of the statute's enumerated grounds, including a finding that the parent "has abandoned the child," "has neglected or abused the child," or has only made "token efforts . . . to support or communicate with the child"). "Second, the court must find that the best interests and welfare of the child are served by terminating the parents' parental rights." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-503(12) (LexisNexis 2012) (providing that if the court finds a parent, "by reason of his conduct or condition, to be unfit or incompetent based upon any of the grounds for termination . . . , the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered"); *id.* § 78A-6-506(3) (same). "A petitioner has the burden of establishing both of these elements by clear and convincing evidence." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *accord* Utah Code Ann. § 78A-6-506(3).

¶19  Here, the juvenile court properly bifurcated the issues of parental unfitness and best interest of the child. Expressly applying section 78A-6-507, the court carefully and thoroughly explained its reasoning for determining that five separate grounds existed for finding Father unfit. In its oral ruling, the court expressed a number of findings in favor of Father. Specifically, the court explained that it believed Father "did have a fairly close father–son relationship" before he kidnapped Mother's parents, which "contributed in some way to the emotional health and support of [Child]." The court also acknowledged that Father paid for a parent-time supervisor and sent some cards to Child from prison. It also weighed heavily that there was no evidence presented that Child had been physically abused, witnessed any violence, or suffered from any psychological effects, concluding "[Father] has never physically injured the child."

¶20  But the court weighed the bulk of its determinations against Father. Specifically, it found that Father "made less than token efforts in support or communication in that his lack of involvement in [Child's] life over the past few years [is] a result of his actions." At the termination proceedings the court stated, "[O]bviously, [Father's] financial support was extraordinarily lacking." It also concluded, "[Father] has abandoned [Child] in that he has failed to communicate with [him] by telephone or otherwise in over 6 months."

¶21  The court further found that Father "is unfit in that the crime that he committed [against Mother's parents] is of such a nature to prove his unfitness in caring for this child's emotional health and development." It also expressed concern about "[Father's] custodial interference charges and his recent criminal history," stating that his "behavior is absolutely deplorable." The court did not believe Father was remorseful for his actions against Mother's parents, explaining, "I'm not convinced those are genuine feelings on his part." The court also determined that Father "has neglected the child" because "the length [of his

prison sentences] would deprive the child of a normal home for one year and that there is a history of violent behavior." "[E]qually deplorable," the court specified, is the "kind of threat[s]" made via text message to Mother and her attorney; the court opined, "No attorney doing their job should ever have to receive a text message like that threatening himself or his family" and "even in a . . . nasty divorce situation, that might be taking things one step too far."

¶22 Further, although the court discounted the credibility of Mother's counselor's testimony regarding Father's psychological evaluation, it gave Father's probation officer's testimony "considerable weight." Particularly, the court expressed concern about Father's drug dependency and mental health issues and his failure to rectify them. It stated, "I'm . . . troubled that there are no verifiable attempts by [Father] to improve his current situation." It further stated, "[T]here is a severe lack of follow-through there to get himself in a situation where his mental health is such as to be stable and healthy and happy and productive." Thus, the court concluded that Father "has only made token efforts to avoid being an unfit parent."

¶23 Despite the lengthy and careful examination of the evidence supporting its finding that Father is an unfit parent, the court made few findings with regard to Child's best interest. The court concluded that Mother failed to meet her burden that termination was in Child's best interest because (1) there was a lack of another person to step in to the role of Father; (2) Child "could benefit from a positive, loving, nurturing relationship with [Father and Father's] extended family"; (3) "[t]he lack of evidence that a relationship with [Father's] extended family is or would be a detriment to the child"; (4) there was "no evidence of psychological or emotional damage from child's previous relationship with [Father]"; and (5) "[t]he District Court in the divorce action did not find it necessary to cutoff contact between [Child] and [Father] after becoming aware of the October 2010 incidents." In making these findings the court explained only

that it gave "little consideration" to the fact that Child's grandfather (Mother's father) has stepped in as a role model and caregiver, concluding that "it is a matter of policy in the state that a child have two parents." It then explained,

> I do, however, believe that this child could benefit from a positive, loving, nurturing relationship with his extended family. I think he has a second family in his life, and having that second family in his life would be in his best interest. And if I were to terminate [Father's] parental rights today, I would be going against what I think is best for this child in that regard.
>
> We have an extended family here who has not proven to be any direct detriment to this child.

The court further explained it was not sure that Father would be able to have a positive, loving, nurturing relationship with Child, but believed that, with Father's family's support, that kind of relationship could be possible. The court restated that it "was so surprised to find that there was no evidence presented that this child was actually suffering any psychological damage or effect from his previous relationship with [Father]." Finally, the court found it "compelling that the divorce court, even when becoming aware of these inciden[ts] in October of 2010, did not feel that it was necessary to prohibit [Father's] contact with this child," then asked rhetorically, "[W]hy would I"? Thus, it concluded there was not "any compelling reason to terminate [Father's] rights if [Child] is not suffering that detriment."

¶24 Determining a child's best interest in termination of parental rights proceedings is a subjective assessment based on the totality of the circumstances. "To determine whether termination of parental rights is in the best interest of the child, the juvenile court must consider 'the physical, mental, or emotional condition and needs of the child.'" *In re T.E.*, 2011 UT

51, ¶ 18, 266 P.3d 739 (quoting Utah Code Ann. § 78A-6-509(1)(a) (LexisNexis Supp. 2011)). When the child is not in the parent's custody, Utah Code section 78A-6-509(b) also requires the court to consider the effort the parent has "made to adjust their circumstances, conduct, or conditions to make [restoring the parent–child relationship] in the child's best interest." But "the court may also consider any other evidence that is probative of what is in the child's best interest." *In re T.E.*, 2011 UT 51, ¶ 18; *see also* Utah Code Ann. § 78A-6-509 (2012). Accordingly, it is proper, in the context of a best-interest determination, for the court to consider the child's bond with caregivers, their need for permanency and stability, and the potential risk of harm if returned to the parents' care. *See In re A.M.*, 2009 UT App 118, ¶¶ 30–33, 208 P.3d 1058 (affirming the grant of a mother's petition to terminate the father's parental rights and relying on evidence that the children's medical and emotional needs were met by the mother and that the children were "doing well" in their new schools).

¶25  Furthermore, "while evidence of unfitness may be probative of both factors of the termination analysis, the best interest analysis includes consideration of the impact of termination on the child, rather than simply on evaluating whether the statutory grounds for termination have been met." *In re M.J.*, 2013 UT App 122, ¶ 26, 302 P.3d 485 (citation and internal quotation marks omitted). In other words, evidence that proves one or more statutory grounds for termination of parental rights may also constitute evidence demonstrating that termination is in the child's best interest, but the court's focus should be on the impact of termination on the child. *In re J.D.*, 2011 UT App 184, ¶ 34, 257 P.3d 1062 (Orme, J., concurring) ("Procedurally, [b]ifurcating the [parental termination] analysis does not require courts to separately hear and consider evidence pertaining to unfitness and best interest." (alterations in original) (citation and internal quotation marks omitted)). "And legally, [i]f the parent–child relationship has been destroyed by the

parent's conduct, or lack of conduct, it is usually in the best interest of the child to terminate that relationship." *Id.* (alteration in original) (citation and internal quotation marks omitted). It is an unusual case where grounds for termination are found but termination is held not to be in the child's best interest. *Id.* ¶ 35 (explaining that these types of cases "are rare"). "Indeed, although the requirement of bifurcated analysis is clearly established by statute and jurisprudence as a practical matter, where grounds for termination are established, the conclusion that termination will be in [a child's] best interest follows almost automatically." *Id.* ¶ 34 (citations omitted)*.* Accordingly, "the two requirements, while theoretically distinct, usually are satisfied hand-in-glove." *Id.* ¶ 36. Thus, although the court must consider the enumerated factors in Utah Code sections 78A-6-507 and 78A-6-509 in finding the grounds for termination when the child is not in the custody of the parent, the court should also consider these factors in deciding whether termination of the parent's rights is in the child's best interest.

¶26   Here, the juvenile court did not consider its findings under section 78A-6-507 in making its best-interest determination; there are no references to those findings in the court's oral or written rulings. Rather, the court's determination focused on ideals and speculative possibilities in the future. But in view of its factual determinations, the court's decision not to terminate is against the clear weight of the evidence and leaves us with a firm conviction that a mistake has been made. *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

¶27   The court improperly discounted Father's criminal conduct, neglectfulness, and nominal efforts to adjust simply because there was a possibility he could improve in the future with help from his family. But

> the weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent

displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past conduct or the parent's delay in rectifying the conduct has had on the parent's ability to resume a parent–child relationship with the child. Thus, although the court has a duty to look forward—i.e., to look at the parent's present ability and the likelihood that the parent will be able to resume parenting within a reasonable time—the court must consider such evidence in light of the parent's past conduct and its debilitating effect on the parent–child relationship. That is, if a parent has demonstrated some improvement in parenting ability but not a strong likelihood that the parent can provide a proper home for the child in the very near future, after a long period of separation, a history of problems and failure to remedy, and deterioration of the relationship between the child and parent, this court should not overturn a court's order terminating parental rights.

*See in re M.L.*, 965 P.2d 551, 561–62 (Utah Ct. App. 1998) (footnotes omitted). Here, the court had just determined that Father was unlikely to improve in the future and had "only made token efforts" to avoid being unfit. Specifically, in finding that Father was unfit, the court expressed concern that Father had a complete lack of accountability, he felt no remorse for his conduct toward Mother's parents, he refused to seek treatment for his mental health and drug issues, and his financial support had been nominal. The court went so far as to say, "I'm just not convinced that [Father] ever will provide support for this child. I do think he sees it as a burden and an obligation that he's not obligated to follow through with unless he's getting what he wants." Furthermore, although the court determined that Father's mother "was not involved or an accomplice to [Father's]

attempts to extend his parent-time," the record is clear that even when he was violating the parent-time order and failing to properly support Child, Father received assistance from his family, including his mother and sister. Yet, in explaining its hope for Father to have a positive relationship with Child in the future, the court indicated a positive relationship could only exist "with his extended family on [his] side."

¶28    The court concluded the evidence did not demonstrate that Father's family would be any detriment to Child. It determined that Child needed a person to "legally" step into a role as parent and that he "could benefit from a positive, loving, nurturing relationship with his extended family." Although ideally children are raised by two nurturing parents and have the benefit of a positive relationship with an extended family, such is not the case in many children's lives today. *See, e.g.*, *In re B.O.*, 2011 UT App 215, ¶ 14, 262 P.3d 46 (affirming termination of parental rights where the child was placed in a single-parent home); *In re C.A.*, 2006 UT App 159U, para. 3 (per curiam) (affirming termination of parental rights where adoptive home had not yet been found). Indeed, the children who are the subject of these types of termination proceedings often have fractured and disjointed lives, and frequently rely on a single parent or adults other than their parents to provide for their most basic needs. Although we may consider the fact that Mother is single and that Child *may* benefit from having two parents and a relationship with extended family, those factors alone are not determinative and do not outweigh the realities of his circumstances—Child is currently in a stable and permanent home with a parent who is capable of supporting him and Father has done almost nothing to provide for him. So, though the court determined that both Mother and Father were often self-serving, the court also determined that it was Father's conduct that destroyed the parent–child relationship in this case. Mother complied with the court's parent-time orders and gave Father every opportunity to have a relationship with Child.

¶29    It is common to affirm termination of parental rights where children have bonded with their caregivers or are thriving. *See, e.g., In re J.D.*, 2011 UT App 184, ¶ 21 (considering that, although they were not yet in an adoptive home, termination was appropriate and the children at issue were adoptable because they were "mentally, physically, and emotionally well" and "capable of bonding in a stable home despite their connection with" their unfit mother); *In re T.H.*, 2009 UT App 340U, para. 5 (per curiam) (considering that child was thriving in foster home); *In re C.B.*, 2009 UT App 290U, para. 7 (per curiam) (explaining that children had stability and had bonded with foster family). Based on the court's undisputed findings of fact, Child has lived with Mother and her parents for seven of the eight years he has been alive, and he was happy and well-adjusted. The court also found that Mother and her parents "have provided for the child financially during that time" and "intend to continue to support" him. Although no evidence was presented that Child has been psychologically or physically harmed by Father's unfitness, the evidence does show that between June 2009 and October 2010, Child's life was significantly disrupted. As the court found, during that time, Child "had involvement with law enforcement as a result of the troublesome relationship between [Mother] and [Father]." And, though Child was not present when Father kidnapped his grandparents at gunpoint in an attempt to reach Mother, police had trouble locating him; and Child, Mother, and Mother's parents had to stay the night in a hotel out of fear of Father.

¶30    Father last saw Child over four years ago (more than half of Child's life) in March 2012, but aside from a few cards and letters he has not communicated with Child, and has repeatedly failed to adjust his condition and circumstances, such as by completing drug treatment or mental health counseling, to make himself fit to parent. Even when Father's parent-time rights were limited to supervised visitation once per week, between October 2010 and March 2012, Child's and Father's relationship was not

consistent. Father did not support Child, and his criminal conduct continued: in May 2011, Father pleaded guilty to violating a protective order and was sentenced to thirty days in jail, and in November 2011, he was found guilty of two counts of criminal interference with custodial rights and sentenced to serve 180 days in jail.

¶31    In determining Child's best interest, the speculative possibility of Father experiencing a dramatic transformation and providing Child with a "positive, loving, nurturing relationship with his extended family" must be weighed against Father's real-world actions as found by the court—his escalating and repeated criminal conduct, his lack of remorse and accountability for his crimes, his lack of support for Child, his unaddressed drug addiction and mental health issues, and his failure to make more than token efforts to adjust. Based on the juvenile court's own findings of fact, we must conclude that this balance tips decisively in favor of termination of Father's parental rights.[4]

---

4. Another concern that touches—not insubstantially—on Child's best interest is Father's pattern of violence and threats toward Mother, her parents, and her attorney, a pattern that is coupled with Father's troubling sense of victimization and a failure to take responsibility. While, as the court noted, Father might improve, it seems at least as likely that the pattern he has already established would continue or even escalate. It is difficult to see how Father's prior obsessive focus on Mother and those connected with her in defiance of court admonishments, orders, and criminal charges does not substantially implicate Child's best interest in a very negative way. A decision that this father, with the potential for any physical or parental proximity to the child and those closes to him, seems to hold much more threat than promise.

¶32 We recognize that the decision to terminate parental rights is among the most difficult of decisions, and we will not substitute our judgment for that of the juvenile court or reweigh the evidence. But we agree with Child's guardian ad litem on appeal that "[t]he juvenile court's oral and written findings as they stand can support only a best-interest determination" that termination is appropriate. We also recognize that termination leaves Father's family without remedy and less of a chance to be involved in Child's life. But Mother and her parents each testified that they want what is best for Child, and the evidence supports a termination of Father's parental rights.

CONCLUSION

¶33 We will not engage in a reweighing of the evidence. But even viewing the evidence and the court's findings with deference to the court's more advantageous position, we conclude that its conclusion that termination is not in Child's best interest is against the clear weight of the evidence, and leaves this court with a firm conviction that a mistake has been made. We therefore reverse the juvenile court's decision not to terminate Father's parental rights and remand with the directive to enter an order consistent with this opinion.

———————