**2026 UT App 24**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF N.E.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

N.E.,
Appellant,
*v.*
STATE OF UTAH AND J.L.P.,
Appellees.

Amended Opinion[*]
No. 20240672-CA
Filed February 12, 2026

Fourth District Juvenile Court, Provo Department
The Honorable Suchada P. Bazzelle
No. 1213360

Martha Pierce, Alisha Giles, and Heath Haacke,
Guardians ad Litem Attorneys for Appellant

Derek E. Brown, Deborah A. Wood, and John M.
Peterson, Attorneys for Appellee State of Utah

Kirstin Norman, Alexandra Mareschal, and Debra
Nelson, Attorneys for Appellee J.L.P.,
assisted by law student Sonya Chechik[1]

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

---

[*] This Amended Opinion replaces the Opinion in Case No. 20240672-CA issued on October 23, 2025. In response to a petition for rehearing by Appellee J.L.P., we have added footnote 3.

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

CHRISTIANSEN FORSTER, Judge:

¶1     Sometime after being removed from the custody of her mother, J.L.P. (Mother), N.E. (Child) was placed in the care of her biological grandfather (Grandfather) and his domestic partner of about thirty years (Grandmother).[2] The State later petitioned for termination of Mother's parental rights. After a trial on the matter, the juvenile court denied the petition, determining that although there were grounds for termination of Mother's parental rights, termination was not strictly necessary. The guardian ad litem (the GAL) now appeals, arguing that the juvenile court's misinterpretation of the applicable statutory requirements and relevant appellate case law led it to ignore certain of its own findings regarding Child's best interest. We agree that the juvenile court's best-interest analysis was based upon a misapplication of the law, and we remand this case to the juvenile court to revisit the best-interest determination based on the further guidance contained herein.

## BACKGROUND

¶2     When Child was six years old, she was removed from Mother's care due to Mother's "substance abuse problem that affect[ed] her ability to parent." The juvenile court thereafter "concluded that [Child] was neglected as to [Mother]," and reunification services commenced. Although Child was initially placed with a foster family, she was later moved to a kinship placement with Grandfather and Grandmother. Grandfather is Child's paternal grandfather. And while Grandmother is neither

---

2. Child's biological father entered a Voluntary Relinquishment of Parental Rights. The juvenile court accepted his relinquishment and permanently terminated his parental rights, and he is therefore no longer involved in this case.

a biological nor legal relative of Child, "she has known [Child] her entire life" and "considers herself [Child's] grandmother."

¶3    Thirteen months after Child's initial removal, the State filed a Verified Petition for Termination of Parental Rights, arguing that Mother's "unresolved substance abuse issues, her inability to demonstrate compliance with the service plan and with [the juvenile court's] other orders, and her ongoing legal troubles" left her "unable to provide proper parental care to [Child]." The State asserted that it was "in the best interest of [Child] that [Mother's] parental rights be terminated so [Child could] be adopted by an appropriate placement who [could] provide [her] with a secure and stable home and who [could] love and protect [her] from abuse and neglect."

¶4    After a trial, the juvenile court issued a written order denying the petition to terminate Mother's parental rights. First, the court determined that the State had "met its burden of proof by clear and convincing evidence" that several grounds existed for the termination of Mother's parental rights. And the court also determined that reasonable reunification efforts had been made. Next, the court addressed the best interest of Child, making the following findings: that it was "probably in [Child's] best interests to have some ongoing contact with [Mother]," that visits with Mother had "been going well," that Mother had "been consistent in having contact with [Child's] custodians and caregivers," that Mother had "made only token efforts to pay a reasonable portion of child support," that Mother "continued to use dangerous drugs throughout the case" and "continued to engage in criminal behavior through the entire reunification period," that the court "was not convinced" that Mother was "in long-term recovery" from her substance abuse and "future relapses [were therefore] likely," that Child's needs would "be best served by the highest level of stability and legal protection for her permanent placement," and that "[a]doption would put [Grandfather] and [Grandmother] in firm control." As a result of these factors, the court concluded, "[T]ermination of parental rights and adoption

is in [Child's] best interests. However, the term 'strictly necessary' speaks against it."

¶5     The juvenile court then proceeded, in a final section of the analysis set off with the subheading "Alternate Options & Strictly Necessary," to address the fact that Child's placement with Grandfather and Grandmother "provides a less restrictive alternative to termination of parental rights, namely permanent custody and guardianship with a relative." The court determined that due to this situation, "there [was] a strong argument under the current case law that a permanent custody and guardianship arrangement [would] serve [Child] just as well as an adoption" and that termination of Mother's parental rights was not strictly necessary. The reasoning of the court was as follows:

> This Court has extensive experience in working with children who have been abused or neglected by parents who are addicted to substances and with the familial dysfunction that surrounds these parents and their children. The dynamic identified by the State [that the option of permanent custody and guardianship with Grandfather and Grandmother would relegate them to many more years of cat-and-mouse] is real and it is detrimental to the long-term stability and wellbeing of children. The Court has observed this dynamic in its own interactions with [Mother] during reunification efforts in this very case and foresees that it will continue as long as [she has] any hold on [Child] and [Child's] guardians. . . .

> This Court is convinced by the arguments of the State and [the GAL], but the current status of case law speaks against them. The appellate courts have made determinations reflecting how much weight should be assigned to certain facts presented to the Juvenile Court. In this case, the fact that

[Child] is with relatives who are willing to accept permanent custody and guardianship and who believe, at least at this moment, that they can work cooperatively with [Mother] will be given far more weight on appeal than will be given to [Child's] need for enhanced stability and protection from conflict. [The State] believes adoption would provide the most control and stability for both the guardians and [Child] and that this is beneficial in heading off future conflict and triangulation as [Child] ages. The Court believes this is true. However, prevailing case law has deemed these factors to be "categorical" and [has] specifically rejected them when used in favor of adoption. The Court disagrees with this analysis.

In this Court's experience, when working with the long-term placement and wellbeing of children who have been harmed by the conduct of unreliable, unfit and/or incompetent parents, in most cases stability *is the point*. Children who have experienced such trauma need stability in order to heal and develop a trusting, reliable relationship with their caregivers. Those caregivers need the legal protection to make decisions unencumbered by a parent who may or may not be healthy enough to make safe, appropriate, child-focused decisions and participate in a positive relationship with the child and guardians. The situation becomes more difficult as children age and are more susceptible to the influence of unhealthy parents who may attempt to undermine or otherwise detract from the authority of the guardian and/or their relationship with the child. The Court has often observed this type of subterfuge leading to the demise of good and stable placements and landing children back in

the foster care system, or at least in litigation. In spite of these concerns, this Court is bound by case law and, even though it seems to be a nullification of the [juvenile] court's role, must weigh the evidence as directed.

. . . [G]iven the current state of the case law and the directive to disregard enhanced stability as a categorical factor in favor of adoption, [Child's] placement with [Grandfather and Grandmother] is a feasible alternative short of terminating [Mother's] rights. Furthermore, they are the only available placement at this time and they are willing to accept either adoption or permanent custody and guardianship. While the Court believes this outcome to be an unfair prioritization of the desires of an unfit parent above the best interests of the child, the Court is bound by the law as it currently exists. In considering alternative options short of terminating [Mother's] rights and in giving full and careful consideration to all of the facts set forth above, the Court does believe that it is in the best interests of [Child] to terminate the parental rights of [Mother]. However, the Court cannot find by clear and convincing evidence that it is strictly necessary to do so.

¶6    Accordingly, the juvenile court denied the petition to terminate Mother's parental rights and, instead, vested permanent legal and physical custody and guardianship of Child in Grandfather and Grandmother. At the close of its order, the court indicated that "[a]dditional orders regarding parent time and child support and other issues pertaining to residual parental rights [would] be entered at a future date," but it also specified, "This is a final order on the State's [termination petition] and the Court's determination of permanent custody and guardianship.

There will be no further orders after this regarding the parental rights of [Mother] . . . ."

¶7      The GAL now appeals the juvenile court's denial of the termination petition, arguing that the court misapplied the relevant law in its best-interest determination.


ISSUES AND STANDARDS OF REVIEW

¶8      In response to the GAL's appeal, Mother argues that this court does not have appellate jurisdiction because the order appealed from is not a final order. *See* Utah R. App. P. 3(a)(1) (providing for the appeal of "a final order or judgment" of the juvenile court). We therefore must, as an initial matter, determine whether we have jurisdiction to adjudicate the GAL's appeal. "The question of whether an order is final and appealable is a question of law." *Powell v. Cannon*, 2008 UT 19, ¶ 9, 179 P.3d 799 (footnote omitted).

¶9      As to the merits of the appeal itself, the GAL argues that the juvenile court misinterpreted the analytical framework for a best-interest analysis and ignored some of its own findings when considering the factors bearing on the best-interest analysis. A best-interest analysis "is a wide-ranging inquiry that asks a court to weigh the entirety of the circumstances, including a parent's past behavior, to determine what is in the best interest of the child under all of the circumstances," *In re J.M.*, 2020 UT App 52, ¶ 35, 463 P.3d 66, and "[w]e review deferentially a lower court's best-interest determination," *In re J.J.W.*, 2022 UT App 116, ¶ 18, 520 P.3d 38. However, "when [juvenile] courts have discretion to weigh factors or balance competing interests, those discretionary determinations must rest upon sound legal principles. A misapplication of the law constitutes an abuse of discretion. Thus, when a legal conclusion is embedded in a [juvenile] court's discretionary determination, we peel back the abuse of discretion standard and look to make sure that the court applied the correct

law." *In re adoption of M.A.*, 2024 UT 6, ¶ 10, 545 P.3d 241 (quotation simplified).

ANALYSIS

I. Jurisdiction

¶10 We must first address Mother's argument that this court does not have jurisdiction to consider the GAL's appeal because the juvenile court's order was not a final, appealable order. "A final order is one that ends the current juvenile proceedings, leaving no question open for further judicial action." *In re S.M.*, 2007 UT 21, ¶ 18, 154 P.3d 835 (quotation simplified). However, "our inquiry into whether an order leaves a question open for further judicial action is often unconcerned with the question of whether the juvenile court's jurisdiction over a minor continues beyond its entry of the order." *Id.* Indeed, "the juvenile court frequently retains jurisdiction over cases after some of the issues have been finally resolved." *Id.*; *see also Ross v. Kracht*, 2025 UT 22, ¶ 13 (explaining that "juvenile court finality is different from district court finality" and that this difference stems "from the unique nature of juvenile court jurisdiction, which often continues after a final judgment is rendered" (quotation simplified)).

¶11 "For instance, the juvenile court retains jurisdiction over a child whose custody is awarded in a neglect proceeding, but that does not mean the neglect adjudication is not final. . . . [A neglect adjudication is a final order] because it ends the current juvenile proceedings begun by the [neglect] petition, and is a final factual determination of the underlying petition." *In re S.M.*, 2007 UT 21, ¶ 18 (quotation simplified). "On the other hand, shelter orders and orders denying motions for temporary custody of children are not final because they make an interim determination pending additional proceedings." *Id.*

¶12 Thus, "in appeals from juvenile court, finality is viewed somewhat more flexibly than in the district court context," and "we evaluate appellate finality based on a pragmatic analysis of the challenged order rather than rigid application of the final judgment rule." *Ross*, 2025 UT 22, ¶ 11 (quotation simplified). "We take this anomalous approach in the juvenile court context to honor the considerations specific to child welfare cases: We draw the definition of an action narrowly because the best interests of the child outweigh the interests of judicial economy." *Id.* (quotation simplified).

¶13 Here, once Child was adjudicated neglected, "the juvenile court had exclusive, continuing subject matter jurisdiction over [Child], and it was free to apply any of the dispositional options available to it." *In re M.J.*, 2011 UT App 398, ¶ 50, 266 P.3d 850 (citation omitted). While that broader action was pending, the State filed a petition seeking to terminate Mother's parental rights. The juvenile court's ultimate denial of that petition entirely ended the proceedings begun by the termination petition and was "a final factual determination of the underlying petition." *In re S.M.*, 2007 UT 21, ¶ 18 (quotation simplified). The court emphasized this point by stating that there would "be no further orders . . . regarding the parental rights of [Mother]." And the additional issues that remained pending—parent-time, child support, "and other issues pertaining to residual parental rights"—were not related to the issue of whether the parental rights of Mother would be terminated. Instead, these were issues related to the broader, underlying adjudication action. Thus, the juvenile court's order was a final determination as to the State's termination petition and qualified as a final, appealable order. We therefore have jurisdiction to consider the juvenile court's order and to address the issue raised in the GAL's appeal.[3]

---

3. As noted, after issuance of the decision in this case, Mother filed a petition for rehearing, asserting that this court's finality

(continued…)

¶14 Mother pushes back, arguing that answering the question on appeal—namely, whether the juvenile court abused its discretion by determining that termination of her parental rights was not strictly necessary to promote Child's best interest—requires an examination of the particular guardianship arrangement ultimately ordered by the court, including its parent-time and child support parameters. Because of that asserted intertwining of the termination inquiry and the as-yet-unresolved parent-time and child support inquires, Mother asserts that the juvenile court's termination determination is not final and appealable. Specifically, she says, "[I]t is too early to tell if the juvenile court erred in determining that the permanent custody and guardianship . . . can equally benefit and protect [Child] because, at the time of the appealed order, we did not yet know what the [permanent custody and guardianship] would

---

determination ignored operative precedent and erroneously extended appellate jurisdiction over non-final dispositional orders. Mother contends that the order denying the State's petition to terminate Mother's parental rights did not effect a change in Child's permanent status and is thus not a final order. Mother is correct that Utah appellate courts have repeatedly determined that "when the effect of an order is to immediately implement a change in the permanent status of the child and requires no further judicial action to be final, the action before the lower court has concluded and the order may be appealed." *In re R.P.*, 2024 UT App 106, ¶ 11, 554 P.3d 1183 (quotation simplified); *see also, e.g., Ross v. Kracht*, 2025 UT 22, ¶ 13; *In re A.C.M.*, 2009 UT 30, ¶ 11, 221 P.3d 185; *In re A.F.*, 2007 UT 69, ¶ 6, 167 P.3d 1070. However, it is well-established that "whether [a juvenile court's] order is final and appealable turns on the substance and effect of an order." *In re R.P.*, 2024 UT App 106, ¶ 11 (quotation simplified). Here, "the substance and effect" of the denial order was a final factual determination of the State's termination petition, which ended the controversy between the litigants. Thus, the denial order is a final appealable order.

look like." Thus, she urges that we "must dismiss the appeal for lack of finality." However, Mother has cited no case where appellate review of a termination decision turned on the contours of the particular guardianship ultimately ordered. Moreover, our supreme court has directed that the proper inquiry in response to a termination petition is "whether *a* permanent guardianship can equally protect and benefit the child[] in the case before [us]," *In re J.A.L.*, 2022 UT 12, ¶ 25, 506 P.3d 606 (emphasis added) (quotation simplified), not a hindsight determination of whether the guardianship granted can equally protect and benefit the child. Accordingly, we reject Mother's proposed approach to finality in this context and, instead, note that the juvenile court's final orders setting the contours of the guardianship in this matter may be separately appealed.

## II. The Best-Interest Analysis

¶15 "To terminate parental rights, a juvenile court must make two separate findings. First, it must find that there are grounds for termination under Utah Code subsection 80-4-301(1).[4] . . . Second, . . . it must find that termination of parental rights is strictly necessary to promote the child's best interest." *In re A.H.*, 2024 UT 26, ¶ 31, 554 P.3d 969 (quotation simplified); *see also* Utah Code § 80-4-104(12)(a) ("[I]f a parent is found, by reason of the parent's conduct or condition, to be unfit or incompetent based upon any of the grounds for termination described in this part, the juvenile court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered."); *id.* § 80-4-104(12)(b) (providing that "determining whether termination is in the best interest of the child" includes "finding, based on the totality of the circumstances, that termination of parental rights, from the child's point of view, is strictly necessary to promote the child's best interest"). "As part of the strictly necessary

---

4. No party challenges the juvenile court's determination that several grounds for termination were proved here.

determination, the juvenile court must explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights. If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." *In re A.H.*, 2024 UT 26, ¶ 32 (quotation simplified); *see also* Utah Code § 80-4-104(12)(b)(ii) (stating that one factor the juvenile court must consider in its strictly necessary determination is whether "due weight" was given to "the efforts to place the child with a relative who has, or is willing to come forward to care for the child").

¶16 The GAL argues that, in two respects, the juvenile court misinterpreted and misapplied this analytical framework. First, the GAL asserts that the juvenile court construed the "strictly necessary" determination "as a separate and decisive element," as opposed to it being a part of the best-interest determination. Second, the GAL asserts that "the juvenile court erroneously ignored its own findings going to Child's heightened need for stability out of an erroneous belief that it could not consider the benefits of adoption as applied to Child's particularized needs." We agree that the juvenile court misapplied the law relevant to its best-interest determination.

¶17 On the first point, we agree that there is at least some indication in the juvenile court's order that the court incorrectly considered the strictly necessary determination to be separate from the best-interest determination. As we have previously recognized, "a court's inquiry into the strict necessity of termination should take place as part of the best-interest inquiry that comprises the second part of the termination test." *In re J.J.W*, 2022 UT App 116, ¶ 28, 520 P.3d 38. But the very structure of the court's order gives the impression that the two were considered as separate questions, addressing best interest and strict necessity in entirely separate sections. Additionally, the court made several statements indicating that it believed Child's best interest *was* served by terminating Mother's parental rights and, thus, making

Child available for adoption, but it then denied the State's termination petition anyway because it thought the strictly necessary determination "sp[oke] against it."

¶18    On the second point, it is quite clear that the juvenile court incorrectly subordinated its findings related to Child's increased stability needs based upon its misunderstanding of appellate case law. In its decision, the juvenile court discussed the troubling dynamic that it had seen in its interactions with Mother (and that it anticipated would continue to occur in the future) wherein Mother used her position to create "conflict and triangulation." Due to this situation, the court considered Child to have a "need for enhanced stability and protection from conflict." However, the court also noted that "appellate courts have made determinations reflecting how much weight should be assigned to certain [factors]." Based on this, the court then reasoned that these factors were outweighed by "the fact that [Child] is with relatives who are willing to accept permanent custody and guardianship and who believe, at least at this moment, that they can work cooperatively with [Mother]." The court therefore concluded that notwithstanding its determination that there was a heightened need for control and stability in Child's life, and a heightened probability that Mother's conduct going forward would likely undermine the guardians' control and efforts to provide stability, "prevailing case law has deemed these factors to be 'categorical,' and [has] specifically rejected them when used in favor of adoption." We agree with the GAL that this is an incorrect expression of Utah law and does not accurately reflect the extent to which stability concerns may appropriately factor into a best-interest analysis.

¶19    In *In re J.A.L.*, 2022 UT 12, 506 P.3d 606, the Utah Supreme Court determined that the juvenile court erred when it rejected a permanent guardianship "on the ground that it would not offer the same degree of permanency as an adoption, given that a permanent guardianship could be terminated at the request of the guardian or at least subject to visitation by the father." *Id.* ¶¶ 23–

24 (quotation simplified). The supreme court acknowledged that "[a] permanent guardianship by definition does not offer the same degree of permanency as an adoption" but noted that "[i]f these categorical concerns were enough, termination and adoption would be strictly necessary across the board." *Id.* ¶ 24. The supreme court concluded, "[The relevant] standard is not met by the categorical concern that a permanent guardianship is not as stable or permanent as an adoption. It requires analysis of the particularized circumstances of the case before the court." *Id.* ¶ 25.

¶20 More recently, the supreme court has provided further explanation regarding *In re J.A.L.*, describing the language used in that opinion as "caution[ing] juvenile courts against relying on the categorical benefits of adoption—i.e., greater stability and permanency—in the best interest analysis." *In re D.S.*, 2025 UT 11, ¶ 49, 568 P.3d 1060 (quotation simplified). But the supreme court clarified that it has "never precluded juvenile courts from taking the differences between permanent guardianship and adoption into account, so long as the reasoning is case specific." *Id.* ¶ 50 (quotation simplified); *see also In re A.H.*, 2024 UT 26, ¶ 69, 554 P.3d 969 ("*In re J.A.L.* did not prohibit courts from taking the differences between permanent guardianship and adoption into account when making the termination decision. These categorical differences cannot be dispositive in and of themselves, but they can be one of the many factors evaluated in the particularized best interest analysis."). And the supreme court, in considering the specific juvenile court order before it in that case, emphasized that "the juvenile court's recognition of the children's particular need for the stability that adoption by [the grandmother] would provide was a valid, individualized ground for the court's best interest determination." *In re D.S.*, 2025 UT 11, ¶ 51.

¶21 Thus, the juvenile court here incorrectly determined that it could not consider the case-specific reasoning wherein it found that Child, due to past circumstances in this case, had a need for "enhanced stability and protection from conflict" and that this specific need was best served under the circumstances of this case

by the permanency of termination and adoption. Several of the court's case-specific subsidiary findings supported this assessment: (1) Mother "is more likely to comply with boundaries . . . when she is sober" but "is deceitful, evasive, volatile and non-compliant" when "she is engaged in substance use"; (2) "there is a strong likelihood that [Mother] will relapse"; and (3) "[i]f this occurs, it will pose significant risk and difficulties for [Grandfather], [Grandmother,] and [Child]." And so long as the court's reasoning regarding stability and permanency was case-specific and based on the specific needs of Child, the categorical differences between adoption and permanent guardianship could be considered as part of the court's best-interest analysis.[5]

---

5. Mother argues that any error the juvenile court made is harmless here because the court subsequently denied the GAL's rule 60(b) motion for relief from judgment, which pointed out the supreme court's later clarification of the *In re J.A.L.* language. Mother argues that we know from this second denial that "the juvenile court has considered the grounds on which this [c]ourt would reverse and saw no reason to change its ruling."

But the juvenile court's denial of the motion was not based on a reconsideration of its best-interest analysis when taking the clarified *In re J.A.L.* language into account. Instead, the denial was based on the juvenile court's reasoning that, notwithstanding the later supreme court clarification, "no prior judgment has been reversed that affects the [c]ourt's legal analysis in the order, making the motion improperly before the court under rule 60(b)(5)." *See* Utah R. Civ. P. 60(b)(5) (providing that a court may relieve a party from an order where "a prior judgment upon which it is based has been reversed or vacated"). We cannot infer from this what the court would decide if allowed to conduct the best-interest determination anew, while considering its case-specific reasoning for Child's need for "enhanced stability and protection from conflict."

¶22    Although we agree with the GAL that the juvenile court misapplied the law when conducting its best-interest analysis, we do not agree with the GAL's further argument that, had the juvenile court not so erred, it "would have been compelled to grant the termination petition." In reviewing the various facts found by the court, it is simply not clear to us what the court's ultimate decision would have been had it not misinterpreted the law—that is, it is at least somewhat questionable whether the court would have determined by clear and convincing evidence that termination was strictly necessary to promote Child's best interest. *See generally In re A.H.*, 2024 UT 26, ¶ 31 ("All of these findings [underlying the termination of parental rights] must be made by clear and convincing evidence."). Our uncertainty here rests on the fact that while the court made plain that it thought adoption was ideal for Child, the court could not allow both Grandfather and Grandmother to adopt Child.

¶23    Under Utah law, "it is not in a minor child's best interest to be adopted by a person or persons who are cohabiting in a relationship that is not a legally valid and binding marriage under the laws of this state." Utah Code § 81-13-202(4)(a). Accordingly, Grandfather and Grandmother may not both adopt Child due to their nonmarried status. In light of this reality, it is not clear that the juvenile court would have determined adoption to be in Child's best interest.[6] The juvenile court's findings reflect that

---

6. The GAL argues that the juvenile court *did* consider this fact when making its ultimate determination. While we agree that the court did note in its lengthy order both the unmarried status of Grandfather and Grandmother and the fact Grandfather was "the proposed adoptive placement of the State," the court also found that "[a]doption would put [Grandfather] and [Grandmother] in firm control" and that "they are willing to adopt." Thus, we are not entirely convinced that the couple's unmarried status was consistently taken into account in all of the court's findings and conclusions.

while Grandfather is involved in making important decisions regarding Child's care and has "a good relationship" with Child, it is Grandmother that "does most of the caretaking of [Child]" and has the closer relationship with her. Indeed, the juvenile court remarked that the fact that Grandfather did not even testify at the termination trial was "curious." Additionally, the court made many positive findings specifically in regard to Grandmother and her beneficial impact on Child's life, such as (1) that Child trusts her and opens up to her, (2) that she and Child "communicate well together," (3) that she has been "teaching [Child] coping skills to manage what is happening in her life," and (4) that due to past events specific to her, she "feels confident that she will know if [Mother] resumes using drugs" and visitation with her consequently becomes less safe.

¶24   Where the court's findings both focused on the positive impact of Grandmother on Child's life and considered that relationship particularly important to provide "the highest level of stability and legal protection for [Child's] permanent placement," and where adoption by both Grandfather and Grandmother is simply not an option, we are uncertain whether the juvenile court would have determined, by clear and convincing evidence, that permanent custody and guardianship (which can reside in *both* Grandfather and Grandmother) would not equally protect and benefit Child—and her enhanced need for stability—as would the option of adoption only by Grandfather.

¶25   Furthermore, even if we did agree with the GAL that "the unchallenged findings can only support one outcome" (which, to be clear, we do not), Utah law would preclude our applying the remedy that the GAL requests—that we "order the juvenile court" to terminate Mother's parental rights. Such a resolution is at odds with the recent relevant precedent established by *In re Z.C.W.*, 2021 UT App 98, 500 P.3d 94. There, the juvenile court, when considering a petition filed by a mother to terminate the father's parental rights in their children, had concluded that there were statutory grounds for termination but that termination had not

been shown to be in the best interest of the children. *See id.* ¶ 4. This court thereafter determined on appeal "that the juvenile court's best-interest analysis was materially flawed" because it had failed to consider the father's "history of domestic violence toward other adults" as applicable to the analysis. *Id.* ¶ 5 (quotation simplified). We therefore vacated the juvenile court's denial of the termination petition and "remanded for the juvenile court to reconsider its best-interest inquiry," specifically instructing the court "to adequately consider all of the proper factors." *Id.* (quotation simplified).

¶26 Upon remand, the juvenile court renewed its best-interest analysis, this time considering the father's history of domestic violence as part of that analysis, and the court again concluded that it had not been shown that the termination of the father's parental rights would be in the children's best interest. *See id.* ¶ 7. However, the court made its renewed assessment based on the evidence presented at the trial two years prior, and it refused to "consider[] any evidence regarding events that allegedly occurred between" the time of the trial and the time of the renewed assessment. *Id.* ¶¶ 6–7. The mother and the children's guardian ad litem thereafter "asked the court for a new trial, contending that the court should re-open the evidence because it was impossible for the court to properly consider best interest without considering evidence of events that ha[d] occurred in the two and a half years since the trial." *Id.* ¶ 8 (quotation simplified). The juvenile court denied the motions, and the mother again appealed. *See id.* ¶¶ 8–9.

¶27 In the second appeal, this court noted that "the best-interest inquiry requires courts to examine all of the relevant facts and circumstances surrounding the child's situation," that "a child's best interest can be determined only by considering the physical, mental, or emotional condition and needs of the child," and that "considerations regarding a child's welfare are rarely, if ever, static." *Id.* ¶¶ 11–12 (quotation simplified). We also reiterated that the court's focus is "firmly fixed on finding the

outcome that best secures the child's well-being" and that, therefore, "concerns about judicial economy" do not "limit the scope of the best-interest inquiry." *Id.* ¶ 11 (quotation simplified). "For these reasons," we continued, "the best-interest inquiry is generally to be conducted in present-tense fashion, with the effective date of the inquiry being the date of the hearing, trial, or other judicial determination. In a best-interest inquiry, the relevant question is almost always this one: what outcome is in the child's best interest *now*?" *Id.* ¶ 12. We then concluded as follows:

> [A] proper best-interest inquiry requires evaluating all relevant past and present circumstances bearing on a child's welfare as of the date of the proceeding. Where an appellate court remands a case for a [juvenile] court to redo its best-interest analysis, that analysis should generally be conducted as of the date of the post-remand proceedings, and the court must consider, in some fashion, any new evidence proffered by the parties.

*Id.* ¶ 19.

¶28 Therefore, based on *In re Z.C.W.* and its very similar factual pattern, we have no hesitation in stating that the best-interest determination upon remand should be approached in a present-tense fashion, evaluating what outcome is currently in Child's best interest.

¶29 The GAL, however, argues that *In re Z.C.W.* is not applicable here because the GAL has not challenged any factual findings on appeal. The only authority that the GAL cites in support of its position that we may order termination here is *In re G.J.C.*, 2016 UT App 147, 379 P.3d 58, *abrogated by In re B.T.B.*, 2018 UT App 157, 436 P.3d 206. In that case, this court determined, "The juvenile court's oral and written findings as they stand can support only a best-interest determination that termination is

appropriate." *Id.* ¶ 32 (quotation simplified). We concluded that the juvenile court's determination to the contrary was "against the clear weight of the evidence, and le[ft] this court with a firm conviction that a mistake ha[d] been made." *Id.* ¶ 33. And we accordingly "reverse[d] the juvenile court's decision not to terminate" and "remand[ed] with the directive to enter an order consistent with [the appellate] opinion." *Id.*

¶30  *In re G.J.C.*, however, was later abrogated by *In re B.T.B.*, 2018 UT App 157, 436 P.3d 206. There, this court recognized that prior appellate cases (including *In re G.J.C.*) had incorrectly extended a statement applicable to child abandonment cases to "categorically declare[] that where grounds for termination are established, the conclusion that termination will be in a child's best interest follows almost automatically." *Id.* ¶ 20 (quotation simplified). We explained that the unwarranted reliance on the "almost automatically" language had, "subtly but meaningfully, shifted the burden of proof in termination of parental rights cases," imposing an extra burden on parents that was "contrary to statutory command." *Id.* ¶ 31. Further, we determined that the prior cases applying the "almost automatically" language were "inconsistent with the relatively new statutory language that allows termination of parental rights only when it is strictly necessary to do so." *Id.* ¶ 32 (quotation simplified). Thus, we are unconvinced that *In re G.J.C.*, which essentially employed an unwarranted presumption of termination once grounds for termination were established, supports the GAL's assertion that we can instruct the juvenile court to order the termination of Mother's parental rights here.

¶31  Hence, based on the above analysis, we reverse the juvenile court's denial of the termination petition, and we remand this case for the juvenile court to reassess whether the termination of Mother's parental rights is strictly necessary to promote Child's best interest—this time considering the strictly necessary analysis as part of the overall best-interest determination, as well as considering any case-specific reasoning related to stability or

permanency as part of that analysis. And this reassessment of Child's best interest should be made in present-tense fashion, as of the time of the proceedings on remand.

## CONCLUSION

¶32    Because the GAL's appeal is taken from a final order of the juvenile court, we have jurisdiction in this matter. And because the juvenile court misapplied the law underlying its best-interest determination, we reverse the court's order and remand for a new best-interest determination consistent with this opinion.

———————